**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| CLOVER STAFFING, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-03-1251 |
| | § | |
| JOHNSON CONTROLS WORLD | § | |
| SERVICES, INC., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

This dispute arises from a contract relating to the provision of facilities management and procurement services. Plaintiff, Clover Staffing, LLC ("Clover"), asserted causes of action for fraud, negligent misrepresentation, breach of contract, tortious interference with contract, and breach of fiduciary duty. Defendant, Johnson Controls World Services, Inc. ("JCI"), has moved for summary judgment as to all Clover's claims. (Docket Entry No. 35). Clover has filed a response, (Docket Entry No. 44), to which JCI has replied, (Docket Entry No. 59), to which Clover filed a surreply, (Docket Entry No. 68). JCI and Clover have filed motions to strike parts of the summary judgment evidence (Docket Entry Nos. 40, 61), as well as replies (Docket Entry Nos. 62, 70). Clover also filed two motions for leave to file an amended complaint. (Docket Entry Nos. 41, 69). Clover has also filed a motion for sanctions. (Docket Entry No. 49). After reviewing the motions and responses, the pleadings, the governing law, and the record, this court grants in part and denies in part JCI's motion

for summary judgment, denies in part and grants in part the motions for leave to amend, denies both motions to strike, and denies without prejudice Clover's motion for sanctions. The reasons are explained below.

## I.    Background

Clover is a Texas limited liability corporation with its principal place of business in Harris County, Texas.  In 1995, Mark and Chris Sutton, brothers who had both worked for BP as property managers and procurement specialists, left BP and developed Clover as a strategic outsourcing company.  The Suttons, through Clover, hoped to deliver property management and procurement services to BP and other companies at discount rates.  JCI is a Florida corporation with a global organization that manages over 1.2 billion square feet of property.[1]

In 1999, JCI and Clover joined in an effort to win a global service provider contract from British Petroleum-Amoco ("BP").  Mark Sutton worked with JCI to submit a joint proposal to BP.  Clover and JCI brought complementary strengths to the proposal; Sutton had longstanding ties to BP, and JCI had a significant organization with several prominent clients.  BP awarded the Global Preferred Supplier Agreement ("GPSA") to Clover and JCI based on the joint proposal, but preferred to contract with a single entity.  (Docket Entry No. 38, Ex. A1).  To accommodate BP's preference, JCI signed the GPSA with BP.  (Docket Entry No. 48, Ex. B at 46–47).  JCI and Clover then negotiated a separate contract to govern

---

[1]    This suit was removed to federal court on the basis of diversity jurisdiction.

their relationship (the "JCI/Clover Contract"). (Docket Entry No. 38, Ex. F). The parties executed the JCI/Clover Contract on November 1, 2000, although the document states that the effective date is January 1, 2000. (*Id.*).

The JCI/Clover Contract outlined the relationship of the two parties, provided compensation to Clover for its work in securing the bid from BP, and bound the parties to numerous rules going forward. Key provisions of the JCI/Clover Contract included Section 1.21, a merger clause stating that the signed contract superseded all prior agreements, written and oral, and prohibiting amendments unless agreed to by both parties in writing; and Section 1.6, which stated that Clover was an independent contractor hired by JCI. (Docket Entry No. 38, Ex. F).

Numerous disputes developed between the parties. Mark Sutton returned to work for BP as the Southwest Region Global Properties and Management Services ("GPM&S") Manager at some point during or soon after the drafting and execution of the JCI/Clover Contract. Mark Sutton arranged to sell his interest in Clover to his brother and sister-in-law, Chris and Carolyn Sutton, at a price and terms that JCI asserts reflects the absence of an arm's-length relationship. JCI, which did not know of Sutton's return to BP or the planned sale of Clover at the time, asserts that this created a conflict of interest. Additionally, JCI claims that Clover failed to meet savings targets and other performance goals set by the JCI/Clover Contract or by JCI itself. During the relevant period, at BP's behest, Clover submitted a bid to provide records management services to BP. JCI took the position (but does not assert in this lawsuit) that Clover's attempt to win this contract constituted a breach

of the noncompete agreement in the JCI/Clover Contract. The parties present dueling accounts of the precise basis and nature of this dispute and the attempted resolutions. The parties also disagree about their respective roles in providing procurement services for third parties. Clover viewed its position under the JCI/Clover Contract as the exclusive provider of procurement services; JCI did not. JCI asserts that it had the right to "self-provide" procurement services to its own clients without having to use Clover, although JCI agrees that Clover was the exclusive outside provider of such services. The parties also dispute JCI's use of a "preferred provider" system. Clover asserts that JCI neither shared nor disclosed the preferred provider system or the additional money it generated. During the period of the JCI/Clover Contract, Clover also expressed concerns that JCI failed to cooperate at the level promised. In short, Clover claims that JCI used Clover to win the GPSA from BP, but had no intention of honoring the promises made in the JCI/Clover Contract. In this lawsuit, Clover alleges fraud, negligent misrepresentation, breach of contract, tortious interference, and breach of fiduciary duty. JCI seeks summary judgment as to each of these causes of action.

## II.     The Standard Under Rule 56

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986); *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1074 (5th Cir. 1997). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. *See Prejean v. Foster*, 227 F.3d 504, 508 (5th Cir. 2000). The nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *See id.* The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Webb v. Cardiothoracic Surgery Assocs.*, 139 F.3d 532, 536 (5th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986).

In deciding a summary judgment motion, the court reviews the facts drawing all reasonable inferences in the light most favorable to the nonmovant. *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon

motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322).

## III.    The Parties' Motions to Strike

Before analyzing the summary judgment motion, the court will address the parties' objections to the summary judgment evidence.  Both parties have filed motions to strike certain evidence and objections to evidence.  (Docket Entry Nos. 40, 61).

### A.    The Applicable Legal Standards

A court considering a summary judgment motion may disregard a nonmovant's affidavit that contradicts, without explanation, previous deposition testimony.  *See S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996); *Thurman v. Sears, Roebuck & Co.*, 952 F.2d 128, 136 n. 23 (5th Cir. 1992); *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991); *Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1123 (D.C. Cir. 1991); *Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 228 (5th Cir. 1984); *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361,1364–66 (8th Cir. 1983); *Mahan v. Boston Water & Sewer Comm'n*, 179 F.R.D. 49, 52–53 (D. Mass. 1998) (citing cases); *Bowser v. McDonald's Corp.*, 714 F. Supp. 839, 843 (S.D. Tex. 1989); *cf. Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 893–94 (5th Cir. 1980).

"'[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would

greatly diminish the utility of summary judgement as a procedure for screening out sham issues of fact.'" *Kennedy*, 952 F.2d at 266 (quoting *Foster v. Arcata Assocs.*, 772 F.2d 1453, 1462 (9th Cir. 1985)). "'When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.'" *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168–72 (7th Cir. 1995) (quoting *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984)). Several courts have recently applied this rule to disregard deposition testimony that contradicts prior sworn testimony without a satisfactory explanation. *See Allied Signal*, 75 F.3d at 1168–72 ; *Brooks v. City of Turlock*, 15 F.3d 1083, 1993 WL 540281, at *2–*3 (9th Cir. Dec. 30, 1993) (unpublished disposition); *Essick v. Yellow Freight Sys., Inc.*, 965 F.2d 334, 335 (7th Cir. 1992).

In *Allied Signal*, the parents of a child injured in an automobile accident gave sworn statements that their child was not wearing his seatbelt during the accident. The mother made this statement in an interrogatory response; the father under oath at a child custody hearing. *See* 75 F.3d at 1171. Both parents reversed themselves in subsequent depositions. The Seventh Circuit disregarded the deposition testimony, and, finding no material fact issue, granted summary judgment in favor of the defendant. *See id.* at 1172. In *Brooks*, the plaintiff submitted a declaration in opposition to the defendant's motion for summary judgment. Two months later, the plaintiff gave deposition testimony that "contradicts in many instances averments made in the declaration." *Brooks*, 1993 WL 540281, at *2.

Finding that the plaintiff had "attempt[ed] to manufacture evidence" by "substantially revis[ing] his deposition testimony in an obvious effort to salvage his claims and create a genuine issue of material fact," the district court disregarded the plaintiff's revised deposition testimony. *Id.* at *2. The Ninth Circuit upheld the district court's decision. *See id.* at *2–*3. In *Essick*, the plaintiff filed a worker's compensation claim with the Illinois Industrial Commission and testified under oath in a hearing before that body. *See* 965 F.2d at 334. The plaintiff subsequently brought a retaliatory discharge lawsuit against his employer. In a deposition for that lawsuit, the plaintiff "gave a completely different . . . response" than he had in his earlier testimony. *Id.* The Seventh Circuit held that the plaintiff could not rely on the inconsistent portion of his deposition testimony to defeat summary judgment.

Rule 56(e) of the Federal Rules of Civil Procedure, with the Federal Rules of Evidence, govern the submission of evidence, including affidavits, in a summary judgment motion. *See, e.g.*, *Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 544 n.13 (5th Cir. 2002) (reviewing the district court's application of FED. R. CIV. P. 56(e) and the rules of evidence in ruling on a summary judgment motion). Rule 56(e) provides that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Federal Rule of Evidence 602 requires that a witness's testimony not be considered unless it is based on personal knowledge. The rules governing hearsay also apply. FED. R. EVID. 802 ("Hearsay is not admissible except

as provided by these rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress.").

**B.     Clover's Motion to Strike and Objections**

Clover moves to strike the affidavits of three individuals: Michael W. Lamach, John McGee, and Roy Cloudsdale. (Docket Entry No. 40). Clover objects that all three affidavits lack statements that the affiant is testifying from personal knowledge and fail to disclose whether the affiant is authorized to speak on behalf of JCI. Alternatively, Clover argues that specific portions of each affidavit should be stricken because the testimony constitutes inadmissible hearsay, is made without personal knowledge, and is based on mere speculation.

JCI responds that each of the three affidavits, taken as a whole, demonstrates that the respective affiant is testifying based on personal knowledge and, based on the high-level positions of all three affiants within JCI, further demonstrates that each had authority to speak on behalf of JCI. (Docket Entry No. 62, ¶ 1). This court agrees. Rule 56(e) does not require that an affiant state specifically that he is testifying from personal knowledge or with the requisite authority. These predicates may be established by the contents of the affidavit. *See United States v. Davis*, 792 F.2d 1299, 1304 (5th Cir. 1986). The content of the three affidavits demonstrate that all three affiants had personal knowledge of the subject matter of their testimony and authority to speak on behalf of JCI. These objections and basis for the motion to strike are denied.

Clover's hearsay objections are also denied. In deciding the summary judgment motion, this court considers only admissible evidence. Most of the evidence objected to as

hearsay was proffered for purposes other than showing the truth of the matter asserted. This court does not accept as fact a legal conclusion or speculation of the declarant or affiant. For example, statements that the term "partnership" and "partnering" were intended to be used as mere business colloqualisms is relevant to show subjective intent – to the extent that is relevant – but is not proof of the legal relationship of the parties. Clover's objections are denied.

### B. JCI's Motion to Strike and Objections

JCI moves to strike portions of the affidavits of both Mark Sutton and Chris Sutton affidavits because the statements are: (1) contradictory to their sworn testimony; (2) made without personal knowledge; and (3) "inaccurate, untrue, or misleading." (Docket Entry No. 61 at 1). JCI also moves to strike certain exhibits as inadmissible hearsay. (*Id.* at 22). As with the objections filed by Clover, this court will not take as a fact or as a legal conclusion an opinion or incompetent evidence of statements made by a declarant. Some of the deposition testimony and affidavits include language beyond the witnesses' personal knowledge. Such testimony cannot be used to create a fact issue or resolve a legal question. For example, both Mark and Chris Sutton attempt to characterize JCI representatives' subjective and individual understanding of the business relationship as a "partnership;" these statements are beyond their personal knowledge. Some of the affidavit statements are appropriately disregarded because they are inconsistent with earlier deposition testimony, with no explanation for the inconsistency. For example, in his affidavit, Chris Sutton claimed specific, personal knowledge of the JCI/Clover Contract negotiations, but in his

deposition he conceded that Mark Sutton alone had negotiating responsibility and involvement. In deciding the motion for summary judgment record, this court does not rely on inadmissible or incompetent summary judgment evidence. The motion to strike is denied.

## IV.     The Breach of Fiduciary Duty Claims

### A.     The Applicable Legal Standard

Texas law recognizes two types of fiduciary relationship.[2] The first is a formal fiduciary relationship, which arises as a matter of law and includes such relationships as partnership, attorney-client, and principal-agent. *See Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998). The second is an informal fiduciary relationship, which can arise "from moral, social, domestic or purely personal relationship called a confidential relationship." *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex. 1998). Clover argues that a partnership (and, alternatively, a confidential relationship) existed between Clover and JCI. (Docket Entry No. 44 at 81–88).

Under the Texas Revised Partnership Act (TRPA), a partnership is defined as an association of two or more persons to carry on a business, as owners, for profit, regardless of whether the persons intended to create a partnership or whether the association is called a "partnership," "joint venture," or other name. TEX. REV. CIV. STAT. art. 6132b-2.02(a) (Vernon Supp. 2004). This relationship must be based on an agreement, either express or implied. *DeNucci v. Moretti*, 1999 WL 250141, at *4 (Tex. App. - Austin, Apr. 29, 1999)

---

[2]     In this diversity case, Texas substantive law applies. *See Finger Furniture Co., Inc. v. Commonwealth Ins. Co.*, 404 F.3d 312, 314 (5th Cir. 2005).

11

(citing *Coastal Plains Dev. Corp. v. Micrea, Inc.*, 572 S.W.2d 285, 287 (Tex. 1978). In determining whether a partnership exists, courts applying Texas law examine five factors: (1) profit sharing; (2) sharing of risks, losses, or liability for third-party claims; (3) contribution of money or property to the partnership; (4) right of control of partnership affairs; and (5) intent of the parties to enter into a partnership. TEX. REV. CIV. STAT. ANN. art. 6132b-2.03(a) (Vernon Supp. 2004). No single factor controls. *Id.* at art. 6132b-2.03(b) (Vernon Supp. 2004); *McDowell v. McDowell*, 143 S.W.3d 124, 129 (Tex. App. – San Antonio, 2004); *see also* Partnership Law Committee Comments, TEX. REV. CIV. STAT. ANN. art. 6132b-2.03 (Vernon Supp. 2004) ("Given the variety of arrangements that people make, . . . it is not feasible to say exactly which factors must be present, or what the relative weights of the factors should be.").

Texas law also recognizes informal relationships in which "one person trusts and relies on another, whether the relation is a more, social, domestic, or purely personal one." *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176 (Tex. 1997). Such a relationship is a "confidential relationship." *Id.* To impose a confidential relationship on a business transaction, the relationship must exist "prior to, and apart from, the agreement [that] made the basis of the suit." *Id.* at 177. "In order to give full force to contracts, [Texas courts] do not create such a relationship lightly [in the business context]." *Id.* "[T]he 'subjective trust' of one party in the other does not create a confidential relationship" that would support imposition of fiduciary obligations. *Robbins v. Payne*, 55 S.W.3d 740, 749

(Tex. App. – Amarillo, 2001) (discussing *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591 (Tex. 1992)). "The fact that one businessman trusts another, and relies upon his promise to perform a contract, does not rise to a confidential relationship." *Crim Truck & Tractor Co.*, 823 S.W.2d at 594. Subjective trust does not convert an arms-length transaction into a fiduciary relationship. *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998) (citing *Swanson*, 959 S.W.2d at 177). Additionally, "the fact that the relationship has been a cordial one, of long duration, [is not] evidence of a confidential relationship." *Meyer v. Cathey*, 167 S.W.3d 327, 331 (Tex. 2005) (quoting *Crim Truck & Tractor Co.*, 823 S.W.2d at 595) (internal marks altered). Even if the two parties have worked together in the past, a court will not imply a fiduciary relationship if the parties engaged in the transactions at arms-length for the parties' mutual benefit. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 288 (Tex. 1998).

### B. Whether Clover and JCI Had a Fiduciary Relationship

Both parties rely heavily on evidence about the JCI/Clover Contract and the contract negotiations. Mark Sutton, the president of Clover, worked at length with JCI to negotiate, revise, re-revise, and execute the JCI/Clover Contract. (Docket Entry No. 48, Ex. I, ¶¶ 23–27). Mark Sutton had negotiated dozens of similar contracts in his career. (Docket Entry No. 48, Ex. A at 235–36). In negotiating the JCI/Clover Contract, Mark Sutton had discussions and numerous email exchanges with JCI representatives. Sutton personally edited drafts of the proposed contract during the negotiations. (Docket Entry No. 48, Ex. A

at 154–56; Docket Entry No. 37, Ex. C ¶¶ 5(e), 5(f)). During the negotiations, JCI altered the draft language to make it clear that Clover was a "sub-contractor" of JCI. Mark Sutton objected to this change in the draft contract. (Docket Entry No. 46, Ex. 71 at 1970; Docket Entry No. 48, Ex. I ¶¶ 23–26). Mark Sutton explicitly requested that the contract state that "the effort was going forward based on the concept of a 'partnership.'" (Docket Entry No. 46, Ex. 71). JCI responded to this and other, similar requests. (Docket Entry No. 46, Ex. 74 at 2433–35, Ex. D at 253). After these exchanges, JCI removed some of the language to which Mark Sutton had objected, but not all. (Docket Entry No. 47, Ex. 82; Docket Entry No. 48, Ex. I, ¶ 28). The JCI/Clover Contract that Mark Sutton executed on behalf of Clover included several important provisions making it clear that Clover was an independent contractor of JCI. Article 1.6 provides, in pertinent part:

> 1.6. <u>Independent Contractor</u>
>
> (a)  Clover's status shall be that of an independent contractor and not that of an a servant, agent, or employee of JCI. Neither Clover nor its officers, directors, shareholders or related affiliates shall hold itself out as, nor claim to be acting as, an employee, agent, or servant of JCI, BP Amoco, or any of their affiliates. Clover is not authorized to, and shall not make or undertake any agreement, understanding, waiver or representation on behalf of JCI or BP Amoco or any of their affiliates, without the prior express written consent of JCI or BP Amoco in each instance.

(Docket Entry No. 38, Ex. F § 1.6). The Contract also contained a merger clause:

> 1.21  <u>Entire Agreement</u>.  This Agreement, including the Recitals, together with the schedules, attachments and exhibits referred to herein, constitute the entire agreement between the

> Parties hereto with respect to the subject matter thereof, and define the entire relationship between the Parties hereto and this Agreement supersedes all prior proposals, agreements, memoranda, understandings, negotiations and discussions, whether written or oral, of the Parties and any other person or entity owned or controlled by a Party, including, without limitation, Crimson Corporate Services, LLC, Clover Staffing, L.L.C. and Mark W. Sutton. No change, amendment or modification of this Agreement shall be binding unless in writing or executed by the Party to be bound thereby.

(*Id.* at § 1.21). The Contract also set out several financial agreements between the parties. Clover, for example, received several payments for its efforts in securing the BP contract. (*Id.* at Recital D). The Contract referred to Clover as an "employee" of JCI and established additional formulas and criteria for compensating Clover for work to be performed in the future. (*Id.* at §§ 2.4, 2.6).

In interpreting a contract, the court's primary concern "is to ascertain and to give effect to the intentions of the parties as expressed in the instrument." *R & P Enter. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980). To achieve this objective, the court considers the contract as a whole. *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994) ("This court is bound to read all parts of a contract together to ascertain the agreement of the parties. The contract must be considered as a whole . . . [and] each part of the contract should be given effect."). When considered as a whole, a contract is ambiguous only if "it is reasonably susceptible to more than one meaning." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). As Texas courts have recognized, "not every difference in the interpretation of a contract or an insurance policy amounts to an ambiguity." *Forbau*,

876 S.W.2d at 134. A court will not find a contract ambiguous if it may properly be given a certain legal meaning or interpretation.

> If [an] agreement is worded so that this Court can ascertain a certain or definite meaning, it is not ambiguous. If the agreement, however, is reasonably susceptible to more than one interpretation, it is ambiguous. A contract is not ambiguous merely because the parties disagree upon the correct interpretation or upon whether it is reasonably open to just one interpretation. If the agreement is ambiguous, summary judgment is improper because interpretation of the agreement is a fact question for the jury.

*Childers v. Pumping Systems Inc.*, 968 F.2d 565, 569 (5th Cir. 1992).

The JCI/Clover Contract provides compelling evidence of the parties' intention *not* to create a partnership. The valid merger clause supplants inconsistent evidence submitted by Clover as to the events before the contract was executed. Evidence as to Mark Sutton's subjective intent does not establish the meaning of unambiguous contract terms or create an ambiguity as to the meaning of those terms. The evidence of Sutton's unsuccessful requests that the contract stipulate a partnership, if anything, shows that the parties did not agree to create a formal partnership. Sophisticated parties negotiated the contract, going through numerous drafts; the fact that the executed contract included a provision explicitly stating that Clover was an independent contractor of JCI is consistent with JCI's position that no partnership existed. *Cf. SAS Institute, Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005) ("[A] court interprets a contract by ascertaining the true objective intentions of the parties, based on the contract language."); *see also Newton et al. v. McCarrick*, 75 S.W.2d 472,

476–77 (Tex. App. – Beaumont 1934, writ dismissed) (in ascertaining whether a partnership existed, "the court may look to the surrounding circumstances at the time the contract was made, the situation and intention of the parties to the contract, and parol testimony is admissible for purposes of throwing light on such matters, and this regardless of whether the language of the contract be ambiguous.").

Clover characterizes the relationship established by the JCI/Clover Contract as one of shared risk, shared profit, shared risks and liabilities to third parties, and shared control of the business. In examining the contract, this court must "consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement." *Frost Nat. Bank v. L & F Distributors, Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (citing *J.M. Davison, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000)). Under the JCI/Clover Contract, Clover shared profits only to the extent that certain provisions required JCI to pay Clover for services rendered. This fact supports the contractor-subcontractor roles stated in the JCI/Clover Contract: JCI paid Clover for its efforts in securing the winning bid from BP and established a basis to pay Clover for specific future work performed.[3] The JCI/Clover Contract also required Clover to bill JCI for its

---

[3] One provision cited by Clover did obligate the parties to divide certain profits evenly. (Docket Entry No. 34, Ex. F art. 2.4(b)(ii)–(v)). However, this provision governs only part of a lengthy arrangement of duties and obligations between Clover and JCI. The profit-sharing arrangement only applied to a very limited aspect of the relationship between Clover and JCI; insufficient to support a finding that a partnership was created.

expenses, which does not indicate a joint venture. Similarly, Clover's claim that it had management responsibility is based on contract language largely taken out of context. Part of the JCI/Clover Contract states that Clover had the responsibility to "direct and drive the development and delivery or sourcing strategy for commodities, services, fixtures and MRO as contained in, or subsequently developed for, the Principal Agreement between JCI and BP." (Docket Entry No. 34, Ex. F art. 2.2(b)). This provision, like others cited by Clover (*see* Docket Entry No. 44 at 82–84), does not support an inference that Clover held management responsibility consistent with a formal, legal partnership. Instead, this contractual language assigns Clover certain responsibilities and reserves others for JCI. Neither party had the right to hire or fire employees of the other; the parties never filed mutual tax returns; BP never paid the entities as a single unit; the contract forbade Clover from acting on JCI's behalf with respect to entering contracts and accepting liability; and the companies maintained separate ownership of documents and materials. (*See* Docket Entry No. 38, Ex. F §§ 1.6, 1.8, 1.9, 2.5). The four corners of the contract – the best objective evidence of the parties' intent – demonstrates the creation of a contractor-subcontractor relationship, not a partnership. *Cf. Wright v. Stone*, 1999 WL 33734469, at *3–*4 (Bankr. W.D. Tex. Jun. 10, 1999) (finding an independent contractor relationship, not a partnership, using similar factors).

Clover introduces several statements about, and references to, a "partnership" or "joint venture" by JCI and Clover representatives, in an effort to create a triable issue of fact

material to its claim that a partnership existed. Clover cites a 1999 meeting between Clover and JCI representatives, including JCI executives Mike Lamach and Roy Cloudsdale. (Docket Entry No. 44 at 10–11, Ex. B at 19, 29). According to Clover, Cloudsdale described the goal of the Clover-JCI combination as a "single purpose joint venture partnership" with the goal of securing a bid from BP for facilities management and procurement. (Docket Entry No. 46, Ex. 56). The parties agreed to proceed relying on oral agreements and intended to memorialize the details when and if BP accepted the bid. (Docket Entry No. 48, Ex. A at 143–47; Docket Entry No. 38, Ex. D, ¶5(b)). Clover also introduces several bid materials the parties submitted to BP in which Clover is variously referred to as JCI's partner or subcontractor. (Docket Entry No. 45, Ex. 19; Docket Entry No. 46, Exs. 56, 57; Docket Entry No. 48, Ex. B at 30).

The documents and references Clover cites are from marketing or promotional materials, or from general correspondence and conversation among those involved in the two businesses. In these materials, correspondence, and conversations, the parties liberally, imprecisely, and frequently use the terms "partner," "partnership," and "joint venture," including in contexts that clearly do not refer to a formal, legal partnership relationship. The materials, for example, include references stating that both Clover and JCI were already "partners" with BP. The summary judgment evidence shows that the persons involved in the exchanges referred to various entities as "partners" and various relationships as "partnerships" in a casual and colloquial sense, describing cooperative efforts rather than a

specific legal status. This evidence does not raise a fact issue as to whether the parties intended a legal, formal partnership. *Cf. Ben Fitzgerald Realty Co. v. Muller*, 846 S.W.2d 110, 121 (Tex. App. – Tyler 1993, writ denied) (holding that legal conclusions by a lay witness do not prove the existence of a partnership). Clover has not created a triable issue of fact material to determining whether a partnership existed between Clover and JCI; as a matter of law, no partnership existed.

Clover has similarly failed to identify or present evidence that raises a disputed fact material to determining whether a confidential relationship existed. Clover cites Mark Sutton's deposition testimony that he trusted and confided in JCI; that JCI and Clover shared confidential information in winning the BP contract; that JCI recognized responsibilities to Clover; and that the JCI executives' references to Clover as a "partner" indicated that a confidential, fiduciary relationship existed. (Docket Entry No. 44 at 86–87). This summary judgment evidence is insufficient, as a matter of law, to preclude summary judgment in JCI's favor on this issue.

Texas courts require a strong showing of a preexisting, confidential relationship to impose informal fiduciary obligations on parties to a business deal. In *Swanson*, the Supreme Court of Texas refused, as a matter of law, to infer a confidential, fiduciary relationship between two contracting parties even though the allegedly breaching party referred to the plaintiffs as "partners," executed contracts and lease applications with third parties as partners, and acted in concert in other negotiations. *Swanson*, 959 S.W.2d at 177. In *Morris*,

the Supreme Court of Texas rejected a claim of confidential relationship between two individuals who had engaged in frequent transactions for their mutual benefit in the past and had been friends and frequent dining partners for four years leading up to the disputed transaction. 167 S.W.3d at 331. None of the summary judgment evidence produced by Clover rises even to this insufficient degree of interaction between the parties, much less the level required to raise a fact issue as to the presence of a confidential relationship.

Unlike the parties in *Swanson*, JCI and Clover did not execute a contract (much less several contracts) as partners. Instead, the only contract on which they worked together was the BP contract. The colloquial references to "partnership" by JCI executives and the general willingness of JCI to work closely with Clover on the BP contract early in the relationship, are similarly insufficient to raise a fact issue as to the existence of a confidential relationship; these statements (both internal and to Clover representatives) indicate only that, at the time, the two companies and their executives wanted to work well together, not that a confidential, fiduciary relationship existed.

Texas cases make it clear that a fiduciary duty will not be engrafted onto a business transaction involving two sophisticated parties represented by counsel negotiating at arms-length. *See, e.g.*, *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 444 (Tex. App. – Dallas 2002, review denied) (affirming directed verdict in defendant's favor in case in which plaintiff subjectively trusted defendant, but introduced no evidence of a long-term relationship beyond the business realm and in which the parties "had an arms-length

relationship, with each party separately represented by its own counsel"). Although Sutton claims that he did not consult his attorney on the specific subcontractor provisions that he challenges, this does not raise a fact issue as to the presence of a confidential relationship. Sutton admitted that he was familiar with the merger clause used in the JCI/Clover Contract, and with its effect. (Docket Entry No. 38, Ex. G at 236). Sutton had negotiated dozens of similar contracts in the past and was actively involved in the negotiations and drafting work that led to the contract at issue. Rather than consulting counsel before signing the contract, which he readily could have done, *id*. at 153–56), Sutton testified that he chose to "sign first and work around [the contract] later." (*Id.* at 239). Given Sutton's sophistication, experience in similar contracts, active role in the drafting and negotiating, and ability to consult counsel, the fact that he chose not to do so does not create a fact issue as to whether a confidential relationship was present between Clover and JCI, as opposed to the contractually-specified independent contractor relationship.

JCI's motion for summary judgment is granted as to Clover's breach of fiduciary duty claims.

## V.    Clover's Fraud Claims

### A.    The Applicable Legal Standard

Under Texas law, fraud requires "a material representation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused

injury." *Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998). A promise to do something in the future constitutes fraud only if the promise is made with no intention of performing it. *See id.* at 48. A "mere failure to perform a contract is not evidence of fraud." *Id.* The party alleging fraud must present evidence relevant to the other party's intent when the representation was made. If a written contract is unambiguous and includes a merger clause, the contract terms cannot be displaced by inconsistent evidence relating to prior negotiations. *See Fisher Controls Int'l, Inc. v. Gibbons*, 911 S.W.2d 135, 141–42 (Tex. App. 1995, writ denied). "When experienced executives represented by counsel voluntarily sign a contract whose terms they know, they should not be allowed to claim fraud in any earlier oral statement inconsistent with a specific contract provision." *Id.* at 142.

Actionable fraud based on nondisclosure requires a showing of a duty to disclose. *See Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex. App. – Houston [14th Dist.] 1997, pet. denied). Whether a duty to disclose exists is a question of law. *See id*. "A duty to disclose may arise when there is a fiduciary relationship." *Falcon Enters, Inc. v. Sugar Creek Section 25*, 1999 WL 966645, *7 (Tex. App. – Houston [14th Dist.] Oct. 29, 1999, review denied) (citing *Ho v. Univ. of Texas at Arlington*, 984 S.W.2d 672, 692 (Tex. App. – Amarillo 1998, review denied)).

### B.    Clover's Fraud Claims

According to Clover, JCI representatives made six specific misrepresentations: (1) representing that JCI was Clover's "partner" in a formal legal sense and would act accordingly; (2) representing that Clover would have the exclusive rights to procurement with BP; (3) representing that Clover would have access to other JCI accounts and a global procurement initiative; (4) failing to disclose its own procurement plan to displace Clover; (5) failing to disclose its intent to use a "rebate" program that conflicted with Clover's contractual duties; and (6) representing that Clover would make money on additional services. (Docket Entry No. 44 at 89). The summary judgment evidence as to these allegations fails to create a triable issue of material fact.

Uncontroverted evidence in the summary judgment record demonstrates that the parties were represented by sophisticated, experienced individuals who entered into the JCI/Clover Contract voluntarily and knowingly, after extensive negotiations. Texas law precludes a claim for fraud based on statements that are inconsistent with express provisions in a contract entered into under such circumstances. *See, e.g.*, *Boggan v. Data Sys. Network Corp.*, 969 F.2d 149, 153–54 (5th Cir. 1992) (applying Texas law and noting "[i]t is well settled that the negotiations and discussions leading up to the writing cannot displace the terms of the written agreement"); *Airborne Freight Corp. v. C.R. Lee Enter., Inc.*, 847 S.W.2d 289, 297 (Tex. App. – El Paso 1992, writ denied) (holding that the written contract abrogated any reliance on an oral promise); *see also Turner v. Johnson & Johnson*, 809 F.2d 90, 97 (1st Cir. 1986) ("[W]here both parties were experienced in business and the contract

was fully negotiated and voluntarily signed, plaintiffs may not raise as fraudulent any prior oral assertion inconsistent with a contract provision that specifically addressed the particular point."). Clover's citations to assurances by JCI personnel to Clover representatives about "partnership" and "loyalty" (*see* Docket Entry No. 44 at 88–89) are legally insufficient to create a fact issue on this claim. The validly-executed JCI/Clover Contract created a contractor-subcontractor relationship. The merger clause in the JCI/Clover Contract superceded prior discussions and negotiations inconsistent with the contractual terms and the legal relationship they created. (Docket Entry No. 38, Ex. F §§ 1.6, 1.21). The fraud claim based on an alleged misrepresentation that the parties would enter a partnership is without merit, as a matter of law.

Clover also argues that JCI committed fraud in representing that the JCI/Clover Contract would make Clover the only provider of procurement services. The summary judgment record does not raise a fact issue as to this alleged misrepresentation. The JCI/Clover Contract does not state that Clover would be the "sole source provider" of procurement services so as to preclude JCI from providing such services itself. Instead, the JCI/Clover Contract uses broad language calling for Clover to "direct and drive" procurement services and specifically addresses Clover's role in providing procurement services in the Naperville and Houston Westlake I and IV locations. (Docket Entry No. 38, Ex. F § 2.2(b)). The JCI/Clover Contract, in limiting itself to these specific locations, does not grant Clover exclusivity for all procurement services. This division of procurement

services is supported by the bid documents both companies submitted to BP, which specify that Clover would provide procurement services to Naperville and the Houston properties alone. (Docket Entry No. 45, Ex. 19 at CLV 2140–41). The bid documents similarly fail to support Clover's claim of exclusivity. (*Id.*).

Clover's assertion that JCI misrepresented that Clover would have access to other JCI accounts and customers to pursue its own global procurement strategy does not support a cause of action for fraud because a JCI/Clover Contract provision specifically addresses Clover's access to customers of JCI (other than BP). The provision states that procurement services with such customers will be pursued "only with the mutual concurrence of Clover and JCI, if the pursuit of same requires access to JCI clients or requires additional resources to be assigned to the effort by JCI." (Docket Entry No. 38, Ex. F § 2.1(b)). To the extent Clover alleges that JCI promised more than the JCI/Clover Contract required, the allegation is precluded by the merger clause. To the extent Clover alleges that JCI failed to comply with the JCI/Clover Contract requirement, the allegation is one for breach of that contract, not fraud.

Clover also alleges that JCI fraudulently failed to disclose its intent to use a "rebate" program that conflicted with Clover's contractual duties. The summary judgment evidence shows that the "rebate" program in effect when Clover signed the JCI/Clover Contract did not apply to the entity that signed the JCI/Clover Contract, the Integrated Facilities Management Division. That division did not merge with JCI until August 2001. The evidence shows that

when the parties entered the JCI/Clover Contract, the Integrated Facilities Management Division did not have a rebate program. (Docket Entry No. 60, Ex. R ¶8). Moreover, JCI had no fiduciary obligation that would impose a duty of disclosure to Clover.

Clover's allegation that JCI fraudulently promised that Clover would make money on additional services fails as a matter of law because it is inconsistent with the express language of the JCI/Clover Contract. The JCI/Clover Contract states that at certain sites, Clover is entitled to receive additional compensation without additional work, but only for the first six months of the agreement. (Docket Entry No. 38, Ex. F § 2.1(f)). The merger clause in the JCI/Clover Contract supercedes prior discussions and negotiations inconsistent with the contractual terms. *Cf. U.S. Quest Ltd. v. Kimmons*, 228 F.3d 399, 403 (5th Cir. 2000) (applying Texas law and affirming a summary judgment award to the defendant for a claim of fraudulent inducement arising out of a contract in which the parties executed a merger clause).

The fraudulent misrepresentation claims are based on a fiduciary duty to disclose, which is not present on this record, or based on statements about aspects of the parties' relationship expressly addressed in the contract they executed. On this record, Clover cannot recover on a claim that JCI committed fraud in making statements inconsistent with the terms Clover agreed to accept when it signed the JCI/Clover Contract. (Docket Entry No. 38, Ex. F, §§ 2.1(b), 2.2(b), 2.2(d), 2.4, 2.6). These are not fraud claims, but rather breach of contract claims.

In addition, Clover fails to create a triable issue of fact on the issue of justifiable and reasonable reliance. Clover cites testimony from Mark and Chris Sutton that they relied on assurances from JCI that Clover would be fully protected and would be considered a partner of JCI. (Docket Entry No. 44 at 94–95; Docket Entry No. 48, Ex. A at 155–62, Ex. C at 43–51). Such conclusory statements fail to create a fact issue as to whether Mark Sutton reasonably relied on the use of the word "partner" to describe cooperative efforts or relationships. The JCI/Clover Contract made it clear that Clover was an independent contractor of JCI and that the contractual terms would trump any prior inconsistent statements. Moreover, reliance on representations made in a business or commercial transaction is not justified when the representation is made in an adversarial context. *McCamish, Martin, Brown & Loeffler v. F. E. Appling Interests*, 991 S.W.2d 787, 794 (Tex. 1999). Given the numerous exchanges of contract and recital drafts, correspondence, and conversations between Sutton and the JCI representatives surrounding the Contract, there is no question that the negotiations were adversarial in nature. Clover has introduced no competent summary judgment evidence that indicates that parties were not operating at arms-length. Clover's argument – that because the parties were in a partnership, they had a fiduciary relationship that made JCI's pre-contract statements about a "partner" or "partnership" sufficient to create a fiduciary relationship – fails because it is inescapably circular. (Docket Entry No. 44 at 97). Mark Sutton's reliance on extracontractual assurances

from JCI are insufficient to create a triable issue of material fact on the reliance element of fraud.  *Cf. Boggan*, 969 F.2d at 153–54.

Summary judgment in JCI's favor on the fraud claims is granted.

## VI.    The Negligent Misrepresentation Claims

### A.    The Applicable Legal Standards

Texas has adopted the RESTATEMENT (SECOND) OF TORTS with respect to claims of negligent misrepresentation.  *See Federal Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442–43 (Tex. 1991).  To recover for negligent misrepresentation, a party must prove that: "(1) the representation was made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies 'false information' for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation."  *Id.* at 442.  The RESTATEMENT (SECOND) OF TORTS § 552B requires the plaintiff to produce evidence of an "independent injury" beyond breach of contract.  *D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 663–64 (Tex. 1998) (quoting and discussing RESTATEMENT (SECOND) OF TORTS § 552B (1997)).  "A common scenario for negligent misrepresentation occurs when a defendant states that a contract exists and the plaintiff relies on the statement, but it is later discovered that the contract was rejected or never completed."  *Agillion, Inc. v. Oliver*, 114 S.W.3d 86, 89 (Tex. App. – Austin 2003, no pet.) (citing *Abbott v. Pollock*, 946 S.W.2d 513, 518 (Tex. App. – Austin 1997, writ denied).  "A claim for negligent misrepresentation is

recognized in the place of a breach of contract claim and is not usually available when a contract was in force between the parties." *Id.*

A two-year statute of limitations governs claims of negligent misrepresentation. *See Milestone Properties, Inc. v. Federated Metals Corp.*, 867 S.W.2d 113, 118-19 (Tex. App. – Austin 1993, no writ). This limitations period may be tolled by the discovery rule. *See HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998). The discovery rule delays "commencement of the limitations period when the nature of the injury is inherently undiscoverable and evidence of the injury is objectively verifiable." *Savine Towing & Transp. Co. v. Holliday Ins. Agency, Inc.*, 54 S.W.3d 57, 60 (Tex. App. – Texarkana 2001, pet. denied). An injury is "inherently undiscoverable" if it is the type of injury that is not generally discoverable through the exercise of reasonable diligence. *Id.* Additionally, an injury is "objectively verifiable if the presence of injury and the producing wrongful act cannot be disputed, and the facts upon which liability is asserted are demonstrated by direct, physical evidence." *Hay v. Shell Oil Co.*, 986 S.W.2d 772, 777 (Tex. App. – Corpus Christi 1999, pet. denied).

### B.    Clover's Negligent Misrepresentation Claim

JCI argues that, as a matter of law, Clover cannot state a claim for negligent misrepresentation because a valid contract existed and addressed the same subjects as the alleged misrepresentations. In its reply, JCI concedes that a cause of action for negligent misrepresentation may exist even if the parties executed a contract addressing the same subjects. (Docket Entry No. 59 at 47–48). JCI argues that in such a case, however, the

misrepresentation must result in an independent injury; in this case, the damages Clover alleges resulted directly or indirectly from alleged breaches of the parties' contract. (*Id.* at 48). *See, e.g.*, *D.S.A., Inc.*, 973 S.W.3d at 664 (clarifying that Texas law requires proof of independent injury and noting that "[r]epudiating the independent injury requirement for negligent misrepresentation claims would potentially convert every contract interpretation dispute into a negligent misrepresentation claim").

Clover fails to cite a case in which a claim of negligent misrepresentation could go to a jury in the face of a valid contract that addresses the same subject. Clover relies on *Agillion, Inc. v. Oliver*, 114 S.W.3d 86 (Tex. App. – Austin, no pet.), but in that case, the court dismissed the plaintiff's claim of negligent misrepresentation because the plaintiff's injury stemmed from an agreement between the two parties that had purportedly been breached. *Id.* at 91. Nevertheless, because Texas law does not erect an absolute bar to claims of negligent misrepresentation even if a contract existed between the parties, this court evaluates the summary judgment record on Clover's negligent misrepresentation claim.

Like the plaintiff in *Oliver*, Clover has failed to introduce evidence that it suffered injury independent from the injury resulting from the breach of contract it alleges. Clover asserts that it suffered damage "in reliance on JCI's promises and representations, including expenses associated with preparing the BP bid, personnel, and moving." (Docket Entry No. 44 at 107). The underlying contract between the parties addresses these issues. Recital D refers to Clover's bid preparation expenses and specifically establishes compensation for these efforts. (Docket Entry No. 38, Ex. F, Recital D). Other parts of the contract set the

terms for payment to Clover for other services rendered. (*See, e.g.*, *id.* at § 2.4). To the extent Clover's negligent misrepresentation claim arises from the representations that are also part of the parties' contract, and did not result in damages independent of the alleged breach of the contract, it is precluded under Texas law. *Cf. Oliver*, 114 S.W.3d at 89 ("If the injury is only the economic loss from a contract itself, the action should be a breach of contract claim.") (citing *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986)).

Clover's additional claims of injury resulting from negligent misrepresentation are restatements of its allegations that a partnership existed and that JCI breached a fiduciary duty to Clover. Because, as a matter of law, no fiduciary or partnership relationship exists, these allegations do not create a triable issue of fact material to the negligent misrepresentation claim. Summary judgment dismissing the negligent misrepresentation claim is granted.[4]

## VII.    The Breach of Contract Claims

### A.        The Applicable Legal Standard

The elements of a breach of contract claim are (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant that (4) results in damages to the plaintiff. *Adams v. H & H Meat Prods., Inc.*, 41 S.W.3d 762, 771 (Tex. App. – Corpus Christi 2001, no pet.); *Prudential Sec., Inc. v. Haugland*, 973 S.W.2d 394, 397 (Tex. App.– El Paso 1998, pet. denied); *Wright v. Christian*

---

[4]        Because JCI's motion for summary judgment on  the negligent misrepresentation claim is granted based on Clover's inability to create a fact issue as to the elements of the claim, the court does not reach the issue of whether the statute of limitations bars this claim.

& *Smith*, 950 S.W.2d 411, 412 (Tex. App. – Houston [1st Dist.] 1997, no pet.); *McCulley Fine Arts Gallery, Inc. v. "X" Partners*, 860 S.W.2d 473, 477 (Tex. App. – El Paso 1993, no writ).

### B.     Clover's Breach of Contract Claims

Clover claims that JCI breached the Clover/JCI Contract in three ways: (1) by refusing to recognize Clover's status as the exclusive provider of procurement services (*see* Docket Entry No. 38, Ex. F, Recital H); (2) by refusing to compensate Clover for "Business Services" (*see id.* at § 2.4(c)) and refusing to allow Clover access to other JCI accounts and customers to pursue a global procurement strategy (*see id.* at art. 2.2(d)); and (3) by refusing to develop an integrated marketing plan (*id.* at art. 2.2(d), Docket Entry No. 44 at 73). The parties do not dispute that a valid contract existed. Based on the summary judgment record, material issues of triable fact exist on all three of the remaining elements of the breach of contract claims. Summary judgment is inappropriate on Clover's breach of contract claims.

## VIII.  The Tortious Interference Claims

### A.     The Applicable Legal Standard

To establish a case for tortious interference with existing contractual relations, a plaintiff must prove (1) the existence of a contract subject to interference, (2) a willful and intentional act of interference, (3) that was the proximate cause of the plaintiff's damages, and (4) that resulted in actual damage or loss. *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282 (Tex. 1996). The person who induces the breach cannot be a contracting party. *Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995).

33

Texas also recognizes a cause of action for tortious interference with prospective business relations. To recover under this cause of action, a plaintiff must prove: "(1) a reasonable probability that the plaintiff would have entered into a business relationship; (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or the defendant knew the interference was certain or substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference." *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 860 (Tex. App. – Houston [14th Dist.] 2001, pet. denied); *see also Wal-Mart Stores, Inc. v. Sturgess*, 52 S.W.3d 711 (Tex. 2001) (discussing the requirements of tortious interference with prospective business relations and clarifying that the plaintiff must demonstrate independently tortious or unlawful activity). "Conduct that is merely 'sharp' or unfair is not actionable and cannot be the basis for an action for tortious interference with prospective relations." *Sturgess*, 52 S.W.3d at 726.

Once the plaintiff establishes the elements of tortious interference, the defendant may prevail by establishing the affirmative defense of justification. *Texas Beef and Cattle Co. v. Green*, 921 S.W.2d 203, 210 (Tex. 1996). The justification defense may be established through proof of the exercise of either the defendant's own legal rights or a good-faith (but ultimately mistaken) claim to a colorable legal right. *Id.* at 211 (citing *Sakowitz, Inc. v. Steck*, 669 S.W.2d 105, 107 (Tex. 1984)). "Thus, if the trial court finds as a matter of law that the defendant had a legal right to interfere with a contract, then the defendant has

conclusively established the justification defense, and the motivation behind assertion of that right is irrelevant." *Id.* (internal citations omitted). The defenses of justification and privilege may be raised to rebut a claim of tortious interference with prospective business relations "only to the extent that they are defenses to the independent tortiousness of the defendant's conduct." *Sturgess*, 52 S.W.3d at 727.

## B. Clover's Tortious Interference Claims

Clover argues that JCI tortiously interfered with its business relations, both existing and prospective, with BP. Each argument is addressed in turn.

### 1. Tortious Interference with Existing Contractual Relations

Clover claims that Cam Nerdahl, JCI's director of the BP Houston account, sabotaged Clover's successful bid to provide records management services to BP. (Docket Entry No. 1, ¶¶ 27–29; Docket Entry No. 44 at 100–05). Clover alleges that it had an oral agreement with JCI releasing Clover from the noncompete language in the JCI/Clover Contract that would have otherwise prevented Clover from seeking the BP records management contract. (Docket Entry No. 1, ¶28). Clover alleges that after Nerdahl allowed Clover to submit a bid to BP, he forced Clover to withdraw from the bidding process based on fraudulent claims that Clover had breached the JCI/Clover Contract. Clover also alleges that Nerdahl "badmouthed" Clover to BP, in violation of the confidentiality provisions of the JCI/Clover Contract.

Clover's claim of interference with existing contract relations fails as a matter of law because Clover did not secure a contract to provide BP with records management services.

(Docket Entry No. 1, ¶ 28; Docket Entry No. 44 at 102 (conceding that "Clover withdrew its winning bid")). Clover cites *El Paso Community Partners v. B & G/Sunrise Joint Venture*, 24 S.W.3d 620, 626 (Tex. App. – Austin 2000, no pet.) to support its claim that a bid is equivalent to a contract. That case does not support Clover's claim. In *El Paso Community Partners*, the court held that a losing bidder in a government contracting procedure lacked standing to challenge the bid process, and further observed that a bid is "an offer to enter into a contract, which the State could accept or reject." *Id.* at 626. Clover's bid for the records management project was an offer to contract with BP, not a contract. "It is axiomatic that a cause of action for tortious interference with a contract will not lie in the absence of a contract." *S & A Marines, Inc. v. Leonard Marine Corp.*, 875 S.W.2d 766, 768 (Tex. App. – Austin 1994, writ denied); *accord Steinmetz & Assocs., Inc. v. Crow*, 700 S.W.2d 276, 277 n.1 (Tex. Civ. App. – San Antonio 1985, writ ref'd n.r.e.); *O'Connor v. Glitsh Eng'g & Sales Corp.*, 589 S.W.2d 808, 809 (Tex. App. – Dallas 1979, no writ). Because Clover withdrew the bid, no contract between BP and Clover came into existence. As a matter of law, Clover cannot recover on a claim of tortious interference with an existing contractual relationship. *Cf. Gillum v. Republic Health Corp.*, 778 S.W.2d 558, 565 (Tex. App. – Dallas 1989, no writ) (summary judgment is appropriate if the trial court can conclusively determine that no contract exists).

Clover also fails to create a triable issue of fact material to JCI's justification defense. Clover relies heavily on the deposition testimony of Nerdahl to support its tortious interference claim. Nerdahl's testimony, taken in the light most favorable to Clover,

demonstrates the basis for Nerdahl's belief that the JCI/Clover Contract prohibited Clover from submitting a bid to BP. (Docket Entry No. 48, Ex. C at 163–200). The JCI/Clover Contract contained the following noncompete clause:

> 1.7 <u>Conflict of Interest/No Compete</u>. Clover represents and warrants that no present or future services provided by Clover to third parties conflict with interests of JCI with respect to services being provided within the scopes of work reflected by the GPM&S budgets for the initial Clover Client. Clover further agrees, on behalf of itself, its affiliates and any person or firm controlled by it, that it shall not solicit or independently engage in business relating to BPI's GPM&S department(s) for the services contained in the Year 2000 GPM&S budget to be managed by JCI which are part of that scope of work to be provided by the Initial Clover Client. This understanding remains in effect for the life of the Agreement, except to the extent specifically authorized elsewhere in the Agreement or subsequent revisions to this Agreement.

(Docket Entry No. 38, Ex. F § 1.7). The JCI/Clover Contract stipulated that any change to the contract could only be effective if both parties signed and executed an amendment. (*Id.* at § 1.21). Nerdahl and JCI could reasonably reject any purported oral amendment to the contract and use the contract's noncompete provision to leverage JCI's position vis-a-vis Clover with respect to the management services business. Even if BP wanted Clover to handle the records management services, Nerdahl's decision to enforce the noncompete agreement strictly, and to pressure Clover to withdraw the bid for records management, although "sharp" (*cf. Sturgess*, 52 S.W.3d at 726), had a legal justification. The JCI/Clover Contract language covered services provided both when the parties signed the contract and in the future. (Docket Entry No. 38, Ex. F § 1.7). The noncompete and amendment

provisions gave Nerdahl a legal basis to interfere as he did.[5]  Even if Clover had a valid

contract for records management services with BP, Clover has failed to identify or present

competent summary judgment evidence creating a triable issue of fact material to JCI's

justification defense.  Summary judgment in JCI's favor is appropriate.

### 2. *Tortious Interference with Prospective Business Relations*

Clover's related claim of tortious interference with prospective business relations

requires a different analysis.  Clover has presented evidence that it had a reasonable

probability of entering into a business relationship with BP for records management services.

Clover has also put forward evidence that JCI intended to prevent Clover from securing the

contract, and that Clover suffered damage as a result.

"Most courts have held that to be 'malicious' an act of tortious interference with a

prospective business relation must be wrongful or unlawful, and intentionally done without

just cause or excuse."  *Sturgess*, 52 S.W.3d at 724.  Clover claims that Nerdahl and JCI

engaged in fraud to prevent Clover from securing the records management contract with BP.

Clover argues that Nerdahl and JCI concocted a "phony amendment" to the JCI/Clover

Contract to force Clover to withdraw its bid for the management services contract.  (Docket

Entry No. 44 at 100–02; Docket Entry No. 45, Ex. 21).  According to Clover, Nerdahl falsely

accused Clover of breaching the noncompete provisions of that contract and fabricated

---

[5]    The Supreme Court of Texas has made clear that the justification defense is as a matter of law for the court to decide.  *See Green*, 921 S.W.2d at 211 ("[I]f the trial court finds *as a matter of law* that the defendant had a legal right to interfere with a contract, then the defendant has conclusively established the justification defense, and the motivation behind assertion of that right is irrelevant.") (internal citations omitted) (emphasis added).

claims that Clover had failed to perform adequately under the contract. In order to "cure" these problems, according to Clover, JCI demanded that Clover forfeit significant benefits under the JCI/Clover Contract or withdraw its bid to provide BP with management services. (Docket Entry No. 44, Exs. 45–47; Docket Entry No. 45, Ex. 21; Docket Entry No. 48, Ex. C at 125).

The competent summary judgment evidence shows that Nerdahl's assertion that Clover breached the noncompete provision of the JCI/Clover Contract had a reasonable basis. As with the tortious interference of existing contract relations claim, Nerdahl's conduct is justifiable based on his understanding of the noncompete and the amendment provisions of the JCI/Clover Contract. Clover's tortious interference with prospective business relations claim also fails.

Clover's claims that Nerdahl violated the confidentiality provisions of the JCI/Clover Contract do not create a disputed fact issue material to the claim for tortious interference with prospective business relations. Clover has not alleged that Nerdahl's statements to BP constituted defamation or a similar, independent tort. Without summary judgment evidence of such a tort, the allegations that Nerdahl "badmouthed" Clover or violated the confidentiality obligations of the JCI/Clover Contract cannot support the tortious interference with prospective contractual relationship claim. *Cf. Sturguss*, 52 S.W.3d at 726.

Clover's allegations sound in contract, not tort. The court grants JCI's motion for summary judgment with respect to the tortious interference claims.

## IX.     Clover's Motions for Leave to Amend

39

Clover has filed two motions for leave to file an amended complaint. (Docket Entry Nos. 41, 42, 69). Johnson Controls World Services, Inc. ("JCI") has responded to the first motion, (Docket Entry No. 54), to which Clover replied (Docket Entry No. 57). JCI has not yet responded to Clover's amended motion to file an amended complaint.

Rule 15 of the Federal Rules of Civil Procedure requires leave of the court for a party to file an amended pleading and provides that such leave "shall be freely given when justice so requires." In deciding whether to grant leave to file an amended pleading, a district court may consider factors such as undue delay; bad faith or dilatory motive on the part of the movant; repeated failure to cure deficiencies by amendments previously allowed; undue prejudice to the opposing party; and futility of amendment. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993). Leave to amend under Rule 15(a) "shall be freely given when justice so requires." However, leave to amend "is by no means automatic." *Little v. Liquid Air Corp.*, 952 F.2d 841, 845–46 (5th Cir. 1992); *Addington v. Farmer's Elevator Mutual Insur. Co.*, 650 F.2d 663, 666 (5th Cir. 1981); *Layfield v. Bill Heard Chevrolet Co.*, 607 F.2d 1097, 1099 (5th Cir. 1979). The decision "lies within the sound discretion of the district court." *Little*, 952 F.2d 841, 846.

In light of the court's ruling on the summary judgment motion, the motion for leave to file an amended complaint is granted in part. The motion is granted with respect to parts (1) and (3) of Clover's Amended Motion For Leave To File An Amended Complaint, (Docket Entry No. 69), to allow Clover to assert a claim of contractual ambiguity pleaded in the alternative, and to request a declaration that Clover, as the identified "exclusive"

provider of procurement services, was the sole source for procurement under the contract. Neither amendment will prejudice JCI, which has already addressed these issues in its summary judgment motion and extensive briefs, or require additional discovery. The motions for leave to amend are denied as futile in all other respect. Clover is ordered to file an amended complaint in conformity with this order within fifteen days.

## X.     Clover's Motion for Sanctions

### A.     The Applicable Legal Standard

Federal courts may sanction parties, and their attorneys, using the courts' inherent power to fashion and impose appropriate sanctions for conduct that abuses the judicial process. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–46 (1991). Federal courts may use their inherent power when the parties' conduct is not controlled by other mechanisms.[6] *Natural Gas Pipeline Co. of America v. Energy Gathering, Inc.*, 2 F.3d 1397, 1408 (5th Cir. 1993). Federal courts may use their inherent power to sanction parties and their attorneys when they have practiced fraud on the court. *Boland Marine & Mfg. Co. v. Rihner,* 41 F.3d 997, 1005 (5th Cir. 1995). Specifically, courts may use their inherent power to sanction parties for destroying or altering relevant evidence, *Pressey v. Patterson*, 898 F.2d 1018, 1023–24 (5th Cir. 1990), and for lying under oath. *Brady v. United States*, 877 F. Supp. 444, 452–53 (D. Ill. 1994).

---

[6]     Federal courts may sanction parties and their attorneys under the Federal Rules of Civil Procedure for filing frivolous motions and pleadings (Rule 11), filing frivolous or unreasonable discovery requests and responses (Rule 26g), failing to participate in pretrial conferences (Rule 16(f)), and for refusing to obey discovery orders and make mandatory disclosures (Rule 37(b)–(c)). Federal courts may also sanction parties and their attorneys pursuant to federal statutes for contempt of court (18 U.S.C. §401) and for unreasonably and vexatiously multiplying court proceedings (28 U.S.C. §1927).

The primary purpose of sanctions is to deter frivolous litigation and abusive tactics. *Chambers*, 501 U.S. at 32; *Pavelic & Le Flore v. Marvel Entertainment Group,* 493 U.S. 120, 126 (1989). The sanction imposed must be "the least severe sanction adequate to achieve the purpose of the rule under which it was imposed." *Chambers*, 501 U.S. at 44; *Scaife v. Associated Air Ctr. Inc.*, 100 F.3d 406, 411 (5th Cir. 1996); *Natural Gas Pipeline Co.*, 2 F.3d at 1406–07. "When a party's deplorable conduct is not effectively sanctionable pursuant to an existing rule or statute, it is appropriate for a district court to rely on its inherent power to impose sanctions." *Carroll v. The Jacques Admiralty Law Firm, P.C.*, 110 F.3d 290, 292 (5th Cir. 1997).

"Trial judges have broad discretion to take measures ranging from a jury instruction on the spoliation presumption to, in the most egregious case, death penalty sanctions." *Trevinio v. Ortega*, 969 S.W.2d 950, 953 (Tex. 1998) (citing *Watson v. Brazos Elec. Power Corp., Inc.*, 918 S.W.2d 639, 643 (Tex. App.-Waco 1996, writ denied); *Ramirez v. Otis Elevator Co.*, 837 S.W.2d 405, 412 (Tex. App.-Dallas 1992, writ denied); TEX. R. CIV. P. 215(b)). In order to impose sanctions against a party under its inherent power, a court must make a specific finding that the party acted in bad faith. *Toon v. Wackenhut Corr. Corp.,* 250 F.3d 950, 952 (5th Cir. 2001) (citing *Goldin v. Bartholow*, 166 F.3d 710, 722 (5th Cir. 1999)). The court is "to conduct an independent investigation in order to determine whether it has been the victim of fraud." *Chambers*, 111 S. Ct. at 2132. Courts have the authority to make credibility determinations to resolve whether such misconduct has occurred. *See*

*Whitehead v. Food Max of Miss., Inc.*, 332 F.3d 796, 808–09 (5th Cir. 2003); *Carroll*, 110 F.3d at 293; *Matter of United Markets Int'l, Inc.*, 24 F.3d 650, 655 (5th Cir. 1994).

"The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)) (additional citations omitted). In evaluating whether evidence was lost because of a routine record retention and destruction policy, a court examines "(1) whether the record retention policy is reasonable considering the facts and circumstances surrounding those documents, (2) whether lawsuits or complaints have been filed frequently concerning the type of records at issue, and (3) whether the document retention policy was instituted in bad faith." *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 746 (8th Cir. 2004). If a routine retention policy has been followed, "there must be some indication of an intent to destroy the evidence for the purpose of obstructing or suppressing the truth in order to impose the sanction of an adverse inference instruction." *Id.* at 747.

### B. Clover's Motion for Sanctions

Clover has filed a motion for sanctions against JCI based on discovery misconduct. (Docket Entry No. 49). Clover asserts that JCI has improperly destroyed or failed to preserve documents, asserted meritless objections and frivolous claims of privilege, and abused this court's confidentiality order. Based on a careful review of the motion and attached exhibits, this court concludes that Clover's allegations as to the substance and type of information that

JCI did not produce in discovery would not have precluded summary judgment on the claims analyzed above.

The record is not sufficient to determine that, viewed as a whole, JCI's discovery conduct warrants sanctions. Both parties are ordered to update the court on the status of discovery. Clover should set out with specificity discovery violations it believes have continued or remain unresolved. JCI must file a response within fifteen days. After hearing from both parties, the court will determine the next appropriate step. The motion for sanctions is dismissed without prejudice at this time.

## X. Conclusion

The motions to strike summary judgment testimony are denied. JCI's motion for summary judgment is granted as to the claims for fraud, negligent misrepresentation, breach of fiduciary duty, and tortious interference with present and prospective contractual relations. The motion for summary judgment is denied on the breach of contract claims. Clover's motion for sanctions is denied without prejudice. Clover is directed to file a report as to the status of discovery and fully describe what it contends are unresolved issues of discovery misconduct. JCI is ordered to respond to Clover's filing within fifteen days. After hearing from both parties on the outstanding discovery disputes, the court will schedule a status conference.

SIGNED on September 27, 2005, at Houston, Texas.

Lee H. Rosenthal
United States District Judge