**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| CLOVER STAFFING, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-03-1251 |
| | § | |
| JOHNSON CONTROLS WORLD | § | |
| SERVICES, INC., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

On November 1, 2000, Clover Staffing, LLC ("Clover") and Johnson Controls World

Services, Inc., ("JCI") executed a Subcontract Services Agreement effective as of January

1, 2000. The Subcontract recited that JCI and Clover had jointly developed a proposal to

furnish certain facilities-management services to BP Amoco Corporation ("BP"); that BP had

elected to award the contract for those services to a single entity, which JCI and Clover

agreed would be JCI; and that JCI had in turn subcontracted with Clover to provide those and

other services. The JCI/Clover Subcontract defined the services that Clover would provide

and Clover's compensation. The Subcontract term was five years, which coincided with the

principal BP/JCI agreement.

The Clover/JCI relationship did not proceed well. Clover sued JCI in 2003, alleging

breach of the Subcontract as well as fraud and other extracontractual claims. In an earlier

Memorandum and Opinion, this court granted JCI's motion for summary judgment as to the

fraud and extracontractual claims.  JCI has  filed a summary judgment motion asserting that Clover cannot recover the breach-of-contract damages it seeks.  JCI asserts that Clover cannot recover the $2.5 million it claims JCI owes for certain "Business Services" for the "Initial Clover Client," both defined terms in the Subcontract.  JCI also moves for summary judgment that Clover cannot recover the $5.9 million in damages it claims for JCI's alleged failure to pay Clover for procurement services to non-BP clients.  (Docket Entry No. 105, 106, 107, 119, 120).  Clover has responded, (Docket Entry No. 112), and JCI has replied, (Docket Entry No. 109).  JCI has also filed a motion to strike certain affidavits Clover submitted in its response to the summary judgment motion.

Based on a careful review of the motions and responses, the record, and the applicable law, this court grants in part and denies in part JCI's motion for summary judgment. Specifically, this court grants JCI's motion as to damages Clover seeks for:  certain services identified in Recital D as included in the "Initial Clover Client" for amounts beyond those set out in the 2000 Operating Budget; damages for 50 percent of gross margins—as opposed to procurement cost-savings—for third-party accounts; damages for breach of Recital H; and damages for failure to develop a marketing plan.  The reasons are set out below.

## I.   The Damages Claims

The factual background is set out in this court's earlier Memorandum and Opinion and is not repeated here.  (Docket Entry No. 71).  Briefly, the Subcontract between JCI and Clover identified four categories of services Clover was to provide:  Business Development Services, Business Services, Procurement Services, and Third Party Services.  In its amended

2

complaint, Clover alleges that JCI breached its contractual duties by failing to pay Clover for Business Services as required under Article 2.4(c)(I) of the Subcontract. (Docket Entry No. 71 at 7). Clover also alleges that JCI breached contractual obligations to cooperate and work with Clover so that it could provide Procurement Services and that JCI blocked Clover from pursuing opportunities to provide Procurement Services. (*Id*.).

Clover has presented its breach of contract damages proof through an expert witness, Jeff Spilker, J.D., C.P.A. In his report of July 19, 2006, Spilker concluded that the economic losses to Clover from JCI's alleged contract breaches amount to "at least" $2,522,489 in unpaid compensation for additional "Business Services" provided to BP and "at least" $8,509,570 in unpaid compensation for procurement services JCI provided to four non-BP clients. (Docket Entry No. 107, Ex. B).

In its summary judgment motion, JCI argues that Clover is not entitled to the Business Services damages it claims. JCI points to Article 1.4 of the Subcontract, which sets out the damages due Clover in the event of JCI's default; Recital D of the Subcontract, which specifies Business Services covered by an annuity JCI paid; Article 2.1(e) of the Subcontract, which states that expansions to or reductions in the scope of Business Services will not affect Clover's compensation; and Article 2.1(f), which states that Clover may receive additional compensation for Business Services provided at additional sites, but only in the first six months of the Subcontract.

Clover responds that Article 2.4(c) of the Subcontract allowed payment for Business Services beyond those covered by the annuity. Clover also argues that the six-month

provision of Article 2.1(f) does not limit such additional compensation to Business Services provided within the first six months of the Subcontract.

With respect to the damages relating to the third-party Procurement Services, JCI asserts that it is entitled to summary judgment because Clover did not perform work for any third-party, non-BP accounts; JCI did not consent to allow Clover access to these accounts; the Clover procurement process strategy was "successful," as required for expansion to third-party accounts; JCI did not use or benefit from Clover's procurement process on these accounts; and Spilker used fifty percent of JCI's gross margin as the measure of damages, while the Subcontract provides for payment to Clover (in the event the prerequisites to any payment are satisfied) based on a percentage of JCI's savings in providing services to its non-BP clients.  Clover responds that because JCI "cut Clover out of any third party opportunities and refused to take the first step in meeting with Clover to allow Clover to become part of any third-party opportunity," the Subcontract does not preclude the damages Clover seeks. (Docket Entry No. 112 at 17).

Additionally, JCI seeks summary judgment as to Clover's breach of contract claims based on JCI's refusal to allow Clover to be the exclusive provider of Procurement Services to BP under Recital H of the Subcontract and based on JCI's failure to develop an integrated marketing plan, on the ground that Clover has failed to present any evidence of what the damages amounts could be.  Clover did not respond to these arguments.

## II.    The Standard Under Rule 56

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56.  Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case.  *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1074 (5th Cir. 1997).  If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response.  *Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings.  *See Prejean v. Foster*, 227 F.3d 504, 508 (5th Cir. 2000).  The nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.  *See id*. The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Webb v. Cardiothoracic Surgery Assocs.*, 139 F.3d 532, 536 (5th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)).  "The mere existence of a scintilla of evidence in support of the plaintiff's position

will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986).

In deciding a summary judgment motion, the court reviews the facts drawing all reasonable inferences in the light most favorable to the nonmovant. *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322).

### III.    The Motion for Summary Judgment as to Clover's "Business Services" Damages Claims

JCI argues that Clover agreed to accept an annuity as full compensation for "Business Services" to the "Initial Clover Client." (Docket Entry No. 106 at 7–8). Recital D identifies "Business Services" for the "Initial Clover Client" as those services in place at four specific BP sites as of the signing of the Letter of Intent between BP and JCI. Those "sites and services" are covered by the $1,335,000 annuity that JCI has already paid Clover. JCI asserts that the $2.5 million in unpaid Business Services compensation Clover seeks is precluded by the Subcontract provisions because the Business Services are covered by the annuity (Recital D and Article 2.1(e)) or are outside the six-month window (Article 2.1(f)).

Recital D states:

D.  The Parties further agree that Clover would be compensated for its efforts leading up to the award of the contract between BP Amoco and JCI.  Upon signature of the contract between BP Amoco and JCI, Clover receives compensation (the obligation for which may not be cancelled, set aside, abated, or voided regardless of the future relationship between BP Amoco and JCI in the form of an annuity calling for payment to Clover of One Million, Three Hundred Thirty-Five and No/100 Dollars ($1,335,000.00). . . . As consideration for this annuity, Clover agreed to forego its share of all Business Services benefits derived by JCI from the BP Amoco contract as it relates to Business Services in support of those operations described as Business Units, Business Unit Resource Departments, and support services contracts and contractors in place in those facilities commonly referred to as WestLake I and WestLake IV in WestLake Park (Houston, Texas), and Naperville and Cantera (Illinois), as of the signing of the Letter of Intent between BPI and JCI.  For the purposes of this Agreement, these sites and services are hereinafter referred to as the "Initial Clover Client" and is defined to include those Business Units, Business Unit Resource Departments, Capital Project Teams, and support services contracts and contractors in place in those facilities commonly referred to as WestLake I and WestLake IV in WestLake Park (Houston, Texas), and Naperville and Cantera (Illinois).  The Initial Clover Client Scope of Services upon which the base cost projection to support this Client was defined in the Global Property Management and Services Year 2000 Operating Budgets for those same said locations and Client, as of the signing of the Letter of Intent between BPI and JCI.  This same said Budget was the basis of the Due Diligence process upon which the JCI commercial compensation and risk model for the Initial Clover Client was based.  In the event that Clover provides Business Services apart from and aside from the JCI/BPI agreement, Clover shall not receive any payment for these services.

(Docket Entry No. 107, Ex. A at 1–2).

Article 2.1(e) states:

7

(e) Clover's obligation to deliver Business Services to the Initial Clover Client has been satisfied. Expansion to or reductions of scope relating to the Business Services scope of work for the Initial Clover Client will have no impact on the Clover work scope or compensation.

Article 2.1(f) states:

(f) Projected new Business Services opportunities beyond the Initial Clover Client, for which Clover will receive additional compensation (as described below, but requiring no additional work on the part of Clover), within six months of this agreement, include but are not limited to: [list of other locations]

*Id*. at 12. The parties agree that opportunities at the sites referred to in Article 2.1(f) did not manifest.

Clover's damages expert, Jeff Spilker, based his damages calculations on three categories of possible compensation beyond the annuity: (1) increases over the 2000 Operating Budget in the dollar amount of services provided to an existing Business Unit, Business Unit Resources Department, or Capital Project Team at one of the four sites defined in the Initial Clover Client; (2) services provided to a new Business Unit, Business Unit Resources Department, or Capital Project Team added to one of the four sites defined as the "Initial Clover Client"; (3) and any Business Services at a new BP site in North America, beyond the four sites set out in the Initial Clover Client definition. (Docket Entry No. 106 at 9).

Recital D defines what is covered by the annuity: "Business Services Benefits derived by JCI from the BP Amoco contract as it relates to Business Services in support of those operations described as Business Units, Business Unit Resources Departments and support

8

services contracts and contractors in place in those facilities commonly referred to as WestLake I and WestLake IV in WestLake Park, (Houston, Texas) and Naperville and Cantera, (Illinois), as of the signing of the Letter of Intent between BPI and JCI." These "sites and services" are the "Initial Clover Client." This term is defined to include "those Business Units, Business Unit Resources Departments, Capital Project Teams and support services contracts and contractors in place in those facilities commonly referred to as WestLake I and WestLake IV in WestLake Park (Houston, Texas), and Naperville and Cantera (Illinois)." To the extent that Clover seeks damages for Business Services that are within the categories of services listed that were in place at the four sites specified in Recital D when the JCI/BP Letter of Intent was signed, those damages are foreclosed by the Subcontract.

Clover argues that it should be able to recover damages based on increases to the amounts budgeted in 2000 for the categories of services and sites defined as the Initial Clover Client. Clover argues that Recital D supports this result because it refers to the Global Property Management and Services year 2000 operating budget as the basis for the annuity. That argument does not, however, support reading Recital D to allow Clover to be paid any increase in the budgeted amounts for the existing categories of services and sites defined as the "Initial Clover Client." Recital D merely states that the 2000 Operating Budget was used as the basis for due diligence and cost projections that the parties considered in arriving at the compensation provided to Clover for the "Initial Clover Client." The unambiguous language of Recital D makes it clear that the "sites and services" that make up the Initial

Clover Client—"those Business Units, Business Unit Resources Departments, Capital Project Teams and support services contracts and contractors in place in those facilities commonly referred to as WestLake I and WestLake IV . . . and Naperville Research Center and Cantera I and II"—are covered by the annuity.  This unambiguous language is consistent with Article 2.1(e), which states that "Clover's obligation to deliver Business Services to the Initial Clover Client has been satisfied.  Expansion to or reductions of scope relating to the Business Services scope of work for the Initial Clover Client will have no impact on the Clover work scope or compensation."  The unambiguous language of Recital D is also consistent with Article 2.4(c), which defines what compensation Clover is to receive for "additional Business Services," defined as those "beyond the Initial Clover Client work scope."  Increases in the amounts budgeted for the types of Business Services identified in Recital D, provided at the sites identified in Recital D, are increases to the Initial Clover Client work scope and covered by the annuity.

Clover argues that this court should consider the affidavit of Mark Sutton as to the meaning of Recital D.  Sutton stated in his affidavit that Recital D was intended to have the annuity compensate for the services and sites identified, as long as those services were not only of that same type and at those same sites but also within the same budgeted amounts as set out in the 2000 Operating Budget.  (Docket Entry No. 112, Ex. B).  Clover submits Mark Sutton's affidavit as extrinsic evidence  to support a contradictory interpretation of contract language the court has found to be unambiguous.  Under Texas law, "[c]ourts interpreting unambiguous contracts are confined to the four corners of the document, and cannot look to

extrinsic evidence to create an ambiguity." *Texas v. Am. Tobacco Co.*, 463 F.3d 399 (5th Cir. 2006) (citing *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 732-33 (Tex.1982));  JCI's  motion to strike the paragraphs of Mark Sutton's affidavit in which he purports to define the parties' intended meaning for "Business Services" to the "Initial Clover Client" in a way inconsistent with the unambiguous language of the Subcontract is granted.[1]

JCI asserts that Clover is not entitled to additional compensation for services provided to a *new* Business Unit, Business Unit Resources Department, or Capital Project Team, that are added to an "Initial Clover Client" site for services provided at sites beyond the four specified in Recital D.  Clover responds that it is entitled to be paid beyond the annuity for services of a type or category beyond the "Business Units, Business Unit Resources Departments, Capital Project Teams and support services contracts and contractors in place" in the four sites defined as included in "Initial Clover Client," or in different sites.  Clover's interpretation is consistent with the unambiguous language of Recital D, which draws a distinction between (1) the identified services in existence at the specific sites when the BP/JCI Letter of Intent was signed (which are covered by the annuity); and (2) new services,

---

[1]      JCI objects to paragraph 23 of Mark Sutton's affidavit as hearsay.  (Docket Entry No. 121).  This paragraph describes BP's statements to both JCI and Clover that JCI had not delivered procurement to BP in the United Kingdom and skepticism about whether JCI could do so in the future.  Such statements are admissible as evidence that BP made them, regardless of their truth; the motion to strike on the basis of hearsay is denied.  JCI also moves to strike paragraph 10 of Chris Sutton's affidavit as parol evidence that is inconsistent with the unambiguous Subcontract language.  That paragraph explains subsequent conduct, not prior negotiations.  The motion to strike that paragraph is denied.  Finally, JCI objects to CIV 001588, attached to Chris Sutton's affidavit, as hearsay.  This objection is sustained because Chris Sutton's affidavit does not lay foundation for, or even mention, CIV 001588.

not in existence when the BP/JCI Letter of Intent was signed, at the specified sites or at different sites (which are not covered by the annuity).

Article 2.4(c) of the Subcontract addresses compensation for "additional Business Services" beyond the Initial Clover Client work scope."   Article 2.4(c)(I) addresses additional Business Services that are provided at the locations for the Initial Clover Client; Articles 2.4(c)(ii) to (vi) address additional Business Services that are provided for BP at locations in North America other than the four specified in Recital D as included in the Initial Clover Client.   JCI asserts that Clover's arguments contradict Articles 2.1(e), (f), and (g) of the Subcontract.

Article 2.4(c) provides for awarding a decreasing share of the gross margin to Clover for "Additional Business Services beyond the Initial Clover Client work scope" over five years:

> (c) Business Services will be compensated in the following manner.   For the purpose of calculating Business Services compensation year one commences on August 1, 2000.
> (I) . . . Compensation for Additional Business Services beyond the Initial Clover Client work scope will commence on the date of the award of the first additional scope of work relating to the Business Services in North American [sic] and run for a period of five (5) years or until termination of the Primary Agreement, which ever comes first.
> (ii) For all additional BP Amoco business added in North America during the first year after the date of award of the first additional scope of work relating to Business Services in North America, JCI will compensate Clover in an amount equal to 100 percent of the gross margin (after deducting G & A).   Payment will be made to Clover for a period of five (5) years or until the term of the Primary Agreement ends, which ever comes first.

(iii) For all additional BP Amoco business added in North America during the second year after the date of award of the first additional scope of work relating to Business Services in North America, JCI will compensate Clover in an amount equal to 75 percent of the gross margin (after deducting G & A). Payment will be made to Clover for a period of four (4) years or until the term of the Primary Agreement ends, which ever comes first.

(iv) For all additional BP Amoco business added in North America during the third year after the date of award of the first additional scope of work relating to Business Services in North America, JCI will compensate Clover in an amount equal to 50 percent of the gross margin (after deducting G & A). Payment will be made to Clover for a period of three (3) years or until the term of the Primary Agreement ends, which ever comes first.

(v) For all additional BP Amoco business added in North America during the fourth year after the date of award of the first additional scope of work relating to Business Services in North America, JCI will compensate Clover in an amount equal to 25 percent of the gross margin (after deducting G & A). Payment will be made to Clover for a period of two (2) years or until the term of the Primary Agreement ends, which ever comes first.

(vi) For all additional BP Amoco business added in North America during the fifth year after the date of award of the first additional scope of work relating to Business Services in North America, JCI will compensate Clover in an amount equal to 10 percent of the gross margin (after deducting G & A). Payment will be made to Clover for a period of one (1) year or until the term of the Primary Agreement ends, which ever comes first.

(Docket Entry No. 107, Ex. A at 18). Clover's damages expert, Spilker, used the Article 2.1(c) declining-revenue-over-five-years formula to calculate damages for additional Business Services. (Docket Entry No. 107, Ex. B at 8).

Article 2.1(e) is consistent with Clover's interpretation of Recital D and Article 2.4(c). Article 2.1(e) states that expanding or reducing the Business Services scope of work

for the Initial Clover Client will not affect Clover's compensation.  Recital D and Article 2.4(c) make it clear that new types or categories of services (beyond those set out in Recital D) provided at the sites set out in Recital D, and services to BP at sites not set out in Recital D, are not within the Business Services scope of work for the Initial Clover Client.  Article 2.1(e) does not preclude Clover from seeking these two categories of additional compensation as damages.

Article 2.1(f) is also consistent with Clover's approach.  Article 2.1(f) does not, as JCI asserts, limit "additional Business Services" to those provided at new sites other than those set out in Recital D.  Article 2.1(f) does not address "additional Business Services," which are defined in Article 2.2(c) to include both existing sites and new sites in North America. Instead, Article 2.1(f) addresses "projected new Business Services opportunities," which are beyond the Initial Clover Client types and categories of services and  at locations beyond the Initial Clover Client sites.  Article 2.1(g) explains that the listed "projected new Business Services opportunities" are "intended to be demonstrative of the . . . opportunities which are under discussion at the time of this agreement."  Article 2.1(g) also explains that Clover is entitled to compensation if the scope of the Initial Clover Client (defined to include both specified services and specified sites) increases as a result of BP acquisitions.  Neither Articles 2.1(f) or 2.1(g) preclude Clover from seeking to recover compensation beyond the annuity for services or sites that are beyond the definition of the Initial Clover Client in Recital D.  JCI asserts, and Clover does not dispute, that Clover is not seeking any damages

for Business Services at new sites added to the BP/JCI Contract or for Business Services at the sites identified in Recital D as a result of a BP acquisition.

JCI also argues that the six-month provision of Article 2.1(f) precludes additional compensation for "projected new Business Services opportunities beyond the Initial Clover Client," for which Clover is not required to do additional work. Clover responds that as to the "projected new Business Services" addressed in Articles 2.1(f) and (g), there is no requirement that the compensation be paid in six months. Instead, according to Clover, it is entitled to payment for new business opportunities under discussion when the Subcontract was executed if they could materialize within six months after November 1, 2000.

Article 2.1(f) only addresses a specific category of additional Business Services beyond those covered in the Recital D definition of the Initial Clover Client: those for which Clover may be compensated without any additional "work effort obligation," for services at sites that are outside the Initial Clover Client sites that are "projected new Business Services opportunities." Article 2.1(g) states that the facilities listed in Article 2.1(f) are "demonstrative" of a certain type of Business Services opportunity: those under discussion at the time of the JCI/Clover Subcontract.

Article 2.1(f) does not address all additional Business Services beyond those covered in Recital D. Article 2.4(c) identifies other categories of additional Business Services for sites and services in North America beyond those set out in Recital D, for which Clover may be compensated, but these appear to require additional "work effort obligation" and are not

additional business opportunities at new sites that were under discussion when the Subcontract was executed.

Article 2.1(f) does not preclude all compensation for additional Business Services after six months, as JCI appears to argue, but only compensation for projected new Business Services opportunities beyond the Initial Clover Client, for which Clover has not provided any additional work effort, if those opportunities were under discussion "at the time of this Agreement." Nor does the phrase "within six months" modify "projected new Business Services opportunities," as Clover argues. Clover's interpretation requires it a rewriting of Article 2.1(f) to state that the "projected new Business Services opportunities beyond the initial Clover Client, for which Clover will receive additional compensation" must have been expected to materialize within six months. Article 2.1(f) does not say this. It describes the "projected new Business Services opportunities" as beyond the Initial Clover Client and at specifically listed sites that are intended to be demonstrative of opportunities "which are under discussion at the time of this Agreement." Article 2.1(f) states that as to these projected new Business Services opportunities, which require no additional work effort by Clover, Clover will receive additional compensation "within six months of this Agreement." Construing the Article to limit the obligation to pay this narrow category of additional compensation for projected new Business Services opportunities within six months of the Agreement is consistent with Article 2.1(g), Article 2.4(c), and Recital D. To the extent the additional Business Services are covered by Article 2.4(c) and not Article 2.1(f), the six-month limit does not apply.

16

To the extent that Clover's damages claim seeks compensation beyond the annuity for increases in the amount of services identified in Recital D as included in the "Initial Clover Client," because the amount is beyond that budgeted in the 2000 Operating Budget, JCI's summary judgment motion is granted; such damages are precluded by the Subcontract.  To the extent that Clover's damages claim seeks compensation for additional types or categories of Business Services or Business Services at additional sites beyond those identified as included in the Initial Clover Client definition set out in Recital D, but not included in the Article 2.1(f) and (g) category of "projected new Business Services," JCI's motion for summary judgment is denied.

### III.    The Motion for Summary Judgment as to Clover's Third-Party Accounts

Clover seeks damages in the amount of 50 percent of gross margins, or $5,987,081, that JCI earned on four "third-party accounts."  The Subcontract defines a "third-party account" as one that is unrelated to the BP account.  The four accounts at issue are Computer Sciences Corp., Baxter Biolife, Spring Industries, and Global Santa Fe.  (Docket Entry No. 107, Ex. B at 11).  Clover asserts that JCI breached the Subcontract by deciding to "cut Clover out of any third-party opportunities" and refusing "to take the first step in meeting with Clover to allow Clover to become part of any third-party opportunity."  (Docket Entry No. 112 at 17).   Article 2.2 of the Subcontract defined the "Detailed Services" to be provided by Clover.   Article 2.2(b) addressed Procurement Services.   A subparagraph addressed third-party opportunities:

Third Party

17

Third Party opportunities include handling the demand for comparable commodities with that of the BPI work effort to drive down cost via discounts made available by way of: incremental volume; application of technology; participation in lower cost sourcing venues available by way of the Third Party; improved process such as Supply Chain efficiencies; payables and receivables process improvements; and reporting. Clover will use reasonable efforts to deliver integrated procurement handling of Third Party business for the purpose of extracting benefits through leverage, process improvements and technology. Initially, roll-out of the process will be limited to BPI locations in North America. Roll-out in other BPI locations outside of North America and the introduction of the process strategy to other non-BPI/JCI locations, though desirable, is predicated on success within the North American continent. If success is achieved in the North American continent, the definition of "success" to be mutually agreed to, JCI will use reasonable efforts to introduce Clover to other JCI locations. When JCI benefits from the Clover procurement process for commodities, as required under this agreement, compensation will be in accordance with the schedule contained in paragraph 2.3.B.ii, a and b. When JCI benefits from the Clover procurement process for commodities for non-BPI clients, compensation will be in accordance with the schedule contained in paragraph 2.3.B.11, c.

(Docket Entry No. 107, Ex. A at 14). Clover alleges that JCI did not introduce it to these third-party opportunities, in breach of the Subcontract, and that JCI abandoned Clover's procurement strategy so that JCI could provide procurement services to the third-party clients while excluding Clover. (Docket Entry No. 112 at 20). Clover argues that its procurement strategies and marketing were a success as defined in Article 2.2(b) and that JCI never informed Clover of any unacceptable performance as required by Article 1.2. (*Id*. at 20–21).

JCI first argues that introducing Clover to third-party accounts required mutual concurrence under Article 2.1(b) of the Subcontract:

> (b) Procurement Services, as they relate to BPI, have no
> geographic boundaries.  Procurement Services as they relate to
> non-BPI opportunities, in support of the BPI contract, will be
> pursued only with mutual concurrence of Clover and JCI, if the
> pursuit of same requires access to JCI clients or requires
> additional resources to be assigned to the effort by JCI.

(Docket Entry No. 107, Ex. A at 12).  JCI has submitted a declaration by Stephen Herbst,

vice-president and general manager for JCI, stating that JCI never agreed to any access by

Clover to JCI's third-party accounts, including Global Santa Fe, Computer Sciences

Corporation, Baxter Biolife, or Springs Industries.  (Docket Entry No. 107, Ex. H).  Clover's

response is that this argument "begs the question" because JCI decided to "cut Clover out of

any third-party opportunities" and refused "to take the first step in meeting with Clover to

allow Clover to become part of any third-party opportunity."  (Docket Entry No. 112 at 17).

Article 2.1(b) of the Subcontract neither obligates JCI to allow Clover to pursue all

non-BPI opportunities nor requires JCI 's concurrence for Clover to pursue all non-BPI

opportunities.  Instead, Article 2.1(b) states that procurement services "as they relate to non-

BPI opportunities, in support of the BPI contract, will be pursued only with mutual

concurrence of Clover and JCI" if two conditions are present:  the pursuit of those services

requires access to JCI clients or "requires additional resources to be assigned to the effort"

by JCI.  As to the first, JCI asserts that Computer Sciences Corporation, Baxter Biolife, and

Springs Industries, have "absolutely no relation to the BPI account whatsoever."  (Docket

Entry No. 106, p. 16).  The parties do not point to evidence in the summary judgment record

as to whether procurement services to the four third–party accounts at issue were:  (1) in

19

support of the BPI contract; (2) could be pursued only with access to JCI clients; or (3) could be pursued only with JCI assigning additional resources to the effort.  If the procurement services at issue were related to non-BPI  opportunities, in support of the BPI contract, and could be pursued only with access to JCI clients or assignment of resources by JCI, then JCI is correct:  Clover cannot recover damages for JCI's refusal to concur in the pursuit of such third-party opportunities.  But if the procurement services at issue were not in support of the BPI contract or could be pursued without access to JCI clients or JCI's assignment of additional resources, Clover may seek damages.  Under the Subcontract, JCI's concurrence is not necessary for Clover to pursue such opportunities.

JCI argues that it did not "benefit" from the Clover procurement process for commodities for non-BPI clients and therefore is under no obligation to compensate Clover under Article 2.2(b).  JCI asserts that there was no "benefit" because it did not use Clover's procurement processes for the four non-BPI client accounts.  (Docket Entry No. 106 at 17). Clover responds that its procurement process resulted in significant savings to JCI in providing procurement services to BP, but acknowledges that "JCI abandoned Clover's procurement strategy" in dealing with third-party clients. (Docket Entry No. 112 at 20–21, Ex. C).  Because the parties appear to agree that JCI did not use the Clover procurement strategy to service third-party clients, it also appears that JCI did not "benefit" from the Clover procurement process in the third-party accounts, as required for compensation in Article 2.2(b).  The question, however, is whether JCI may be required to pay damages for blocking Clover's ability to provide services to those third parties.

JCI argues that Clover is not entitled to any damages for the lack of an opportunity to provide third-party services because the prerequisite "success" in its process strategy in the North American continent did not occur.  The Subcontract provision on "success" states as follows:

> Clover will use reasonable efforts to deliver integrated procurement handling of Third Party business for the purpose of extracting benefits through leverage, process improvements and technology.  Initially, roll-out of the process will be limited to BPI locations in North America.  Roll-out in other BPI locations outside of North America and the introduction of the process strategy to other non-BPI/JCI locations, though desirable, is predicated on success within the North American continent.  If success is achieved in the North American continent, the definition of "success" to be mutually agreed to, JCI will use reasonable efforts to introduce Clover to other JCI locations.

(Docket Entry No. 107, Ex. A at 14).

JCI argues that it was not obligated to introduce Clover to non-BP opportunities because Clover's efforts were not a "success": the GPSA did not expand beyond the original sites identified in Recital D to other BP locations in North America; JCI had to eliminate the positions of project director and global finance director as a result; and BP did not renew the GPSA at the end of the five-year BP/JCI contract term.  (Docket Entry No. 106 at 16).  Clover responds that there is summary judgment evidence to show that "success in the North American continent" was achieved, fulfilling this condition to JCI's obligation to "use reasonable efforts to introduce Clover to other JCI locations."  (Docket Entry No. 107, Ex. A at 15).  Clover asserts that JCI used Clover's marketing materials and procurement strategy in obtaining BP's award of the GPSA to JCI.  Clover also asserts that in the first year of the

21

Subcontract, Chris Sutton was in charge of procurement and used Clover's model; although

JCI later discontinued using Clover's model according to Clover, "those procurement sources

that Chris Sutton had put in place accounted for much of the second 12% of savings that JCI

was obligated to realize for BP per the GPS&A," amounting to "success" under the

Subcontract section 2.2(b), defining third-party account procurement services.   (Docket

Entry No. 112, p. 18).

Under the Subcontract, "success within the North American continent" is a condition

precedent to JCI's obligation to "use reasonable efforts to introduce Clover to other JCI

locations."   Under Texas law, the court must examine the entire contract to determine

whether a contract contains a condition precedent.   A condition precedent that results in

forfeiture "must be avoided unless the language will admit of no other construction." *Calpine*

*Producer Services, L.P. v. Wiser Oil Co.*, 169 S.W.3d 783, 788 (Tex.App.—Dallas 2005, no

writ) (citing *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945

(Tex.1990)).   "In order to make performance specifically conditional, a term such as 'if,'

'provided that,' or some similar phrase of conditional language must normally be included."

*Texas Dept. of Housing and Community Affairs v. Texas Dept. of Housing and Community*

*Affairs v. Verex Assur., Inc.*, 68 F.3d 922, 929–30 (5th Cir. 1995) (citing *Criswell*, 792

S.W.2d at 948) (finding condition precedent for "under the following terms and

conditions.").

The language "[i]f success is achieved in the North American continent, . . . the

definition of 'success' to be mutually agreed to," sets out a condition precedent to JCI's

obligation to use reasonable efforts to introduce Clover to other JCI clients. The parties dispute whether "success" was achieved, and the present record is inadequate to allow a finding that, as a matter of law, success was or was not achieved. The contract language at issue is a specific type of condition-precedent clause that is treated in a different way from other condition-precedent provisions under Texas law. The language requiring that "success in the North American continent" be achieved and that what constitutes success has to be "mutually agreed to" appears to be a condition of satisfaction by JCI and by Clover.

In *Black Lake Pipe Co. v. Union Const. Co.*, 538 S.W.2d 80 (Tex. 1976), *overruled on other grounds, Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989), the Texas Supreme Court considered a condition of satisfaction and concluded that it could provide the basis for a binding contract. "The general rule in such cases is that the judgment of the party regarding the adequacy of performance will be upheld if made in good faith." *Id.* at 88. The Texas Supreme Court used an "objective reasonableness" test to determine whether the performance was satisfactory. *Id.* at 89; *see also Texas Dept. of Transp. v. Jones Bros. Dirt & Paving Contractors*, 24 S.W.3d 893, 898-99 (Tex.App.—Austin 2000), *rev'd on other grounds*, 92 S.W.3d 477 (Tex. 2002); *Comm'ns Transmission, Inc. v. TriStar Comm'ns, Inc.*, 798 F.Supp. 406 (W.D. Tex.1992) ("The standard is whether the performance would satisfy a reasonable person."). "This is an objective standard which does not seek to find the mental state of satisfaction of that party, but rather whether the performance would satisfy a reasonable person." *Cranetex, Inc. v. Precision Crane & Rigging of Houston*, Inc., 760 S.W.2d 298 (Tex.App.—Texarkana,1988 writ denied).

23

Texas law does not imply a duty of good faith and fair dealing in contracts generally. But under Texas law, a contract with a satisfaction clause relating to "matters of commercial value" requires that the party must "act in good faith and must be honestly dissatisfied." *Comm'ns Transmission,* 798 F.Supp. at 409 (citing *Anahuac, Inc. v. Wilkes*, 622 S.W.2d 634, 637 (Tex. App.--Austin 1981, no writ)).   Whether a party acted in good faith and was honestly dissatisfied—that is, was objectively reasonable—is generally a question of fact. *Comm'ns Transmission,* 798 F.Supp. at 409.   Clover has pointed to evidence that JCI did not give notice of deficient performance, despite the requirement in Article 1.2 of the Subcontract that Clover be notified of unacceptable performance and evidence that JCI representatives had not heard complaints about Clover's work at different times.   (Docket Entry No. 112, Ex. F at 42–43).   The evidence in the summary judgment record raises disputed facts material to deciding whether JCI was objectively reasonable in concluding that JCI's process strategy in the BP locations in North America had not achieved "success" and therefore that JCI had no obligation to introduce Clover to other JCI locations.

The Article 2.2(b) subparagraph on "Third Party" addresses how Clover will be compensated for certain kinds of procurement services.   Under the subparagraph, when JCI benefits from the Clover procurement process for commodities for BP, compensation will be in accordance with the schedule contained in paragraph 2.3.B.ii, a and b.   This is apparently a typographical error, because the Subcontract does not contain this paragraph. The correct reference appears to be to Articles 2.4(b)(ii) and (iii), which addresses compensation for savings to JCI as a result of Procurement Services to BP.   This does not

24

address third-party compensation. The subparagraph also provides that "[w]hen JCI benefits from the Clover procurement process for commodities for non-BPI clients, compensation will be in accordance with the schedule contained in paragraph 2.3.B.11, c." The correct reference appears to be to Article 2.4(b)(v), which states: "Benefit derived from 3rd parties procurement cost-savings (non-BPI) will be shared 50 percent/50 percent to JCI and Clover, respectively." The parties dispute whether JCI was required to introduce Clover to third-party accounts. This dispute precludes summary judgment as to whether Clover is entitled to damages for third-party procurement services in accordance with the Subcontract.

JCI also asserts that as to one of the accounts, Global Santa Fe, Clover was fully compensated through a change order in 2000, which paid Clover for five years based on estimated gross margin for those services. (Docket Entry No. 108 at 1). JCI explains that, at the time, the Global Santa Fe account was a BP acquisition covered by Article 2.1(g) and that in 2002 the account left BP management, making it a third-party account. (*Id*. at 2). JCI claims that the loss in revenue with the ownership change offsets its payment to Clover. If JCI is correct as to the payments made, services provided, and the ownership of Global Santa Fe, this payment would be excluded from the recoverable damages.

JCI finally argues that if Clover is entitled to damages relating to procurement services provided to third-party accounts, Clover should be awarded only a 50 percent share of procurement cost-savings, not 50 percent of the gross margins. (Docket Entry No. 106 at 14–16). Clover responds that the "only measure of damages available to Clover is the gross

25

margin that JCI actually received on Third-Party services it performed while excluding Clover."  (Docket Entry No. 112 at 22).

The Subcontract outlines the compensation Clover is entitled to receive for different types of services to third parties.  For "Procurement Services," Article 2.4(b)(v) states, "[b]enefit derived from 3rd party procurement cost-savings (non-BPI) will be shared 50 percent/50 percent to JCI and Clover, respectively."  (Docket Entry No. 107, Ex. A at 18). Other parts of the Subcontract, such as section 2.4(c), provide for compensation based on a percentage of the gross margin after deducting G & A.[2]  For "Business Services," for example, Articles 2.4(c)(ii) to (vi) provide for payments of certain percentages of the gross margin for additional BP business added in North America in each of the five years of the Subcontract.  This provision would apply to the Global Santa Fe account before it left BP control, if it was additional BP business at that time.  For "Business Development," Articles 2.4(d)(ii) and (iii) state that Clover will receive certain percentages of the first year's gross margin for services provided at BP locations outside North America and at any non-BP locations.  The Subcontract provides, however, that as to these categories, "engagement of Clover will be at JCI's discretion, except where Clover is identified as the entity, which initiates the opportunity."  (Docket Entry No. 107, Ex. A at 18–19)  If "Clover is identified as the entity which initiates the opportunity, then compensation is not at JCI's discretion and follows terms of 2.4(d)(ii) and (iii)."  The Subcontract clearly distinguishes between

---

[2]      "G & A" means general and administrative costs.  *See Stearns Airport Equipment Co., Inc. v. FMC Corp.*, 170 F.3d 518, 533–34 (5th Cir. 1999) (interpreting an undefined "G & A" contract term).

26

compensation based on percentages of gross margins for third-party procurement services (and other services) on the one hand and compensation based on percentages of the benefits JCI derives from third-party procurement services (as well as other services) on the other hand.

Clover argues that it was improperly excluded from third-party procurement service opportunities.  Procurement cost-savings are the proper measure of its damages for the breach it alleges.  Clover's argument that it cannot determine this amount is unsupported. Even under Clover's own argument that it was improperly excluded from third-party account opportunities, the measure of damages is 50 percent of the procurement cost-savings to JCI for the third-party accounts, not 50 percent of the gross margins for those accounts.

In sum, JCI's motion for summary judgment as to the third-party account damages claim is granted in part and denied in part.  It is granted to the extent that Clover may not, for third-party procurement services, claim damages for 50 percent of the gross margins, but rather 50 percent of the procurement cost-savings to JCI, and otherwise denied.

## IV.    The Motion for Summary Judgment as to the Damages Claimed for the Alleged Breach of Recital H

This court previously found disputed fact issues material to determining whether JCI breached Recital H of the Subcontract in refusing to recognize Clover as the exclusive provider of the procurement services defined in section 2.2(b) of the Subcontract, which addresses procurement services for "commodities services, fixtures and MRO as contained in, or subsequently developed for, the Principal Agreement between JCI and BPI for North

America." (Docket Entry No. 71 at 33).  JCI moves for summary judgment as to this claim of breach because Clover's damages expert, Spilker, acknowledged that any  damages resulting from that alleged breach "wouldn't be reasonably certain." (Docket Entry No. 106 at 20).  JCI cites cases such as *Sullivan v. Smith*, 110 S.W.3d 545 (Tex.App.—Beaumont 2003, no writ), holding that quantifiable, nonspeculative damages calculation is an essential part of a breach of contract claim

In his report, Spilker states that "[a]t this time we have been unable to quantify the losses to Clover as a result of JCI abandoning the Clover procurement strategies." (Docket Entry No. 107, Ex. B at 7).  In his deposition, Spilker was asked whether "any such projection or statement of damages would be speculative."  He answered:  "Well, it—it wouldn't be reasonably certain." (Docket Entry No. 107, Ex. C at 73).

Under Texas law, "[a] party who breaks his contract cannot escape liability because it is impossible to state or prove a perfect measure of damages." *Southwest Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097, 1099 (1938). A plaintiff must present evidence "sufficient to afford a reasonable basis for determining his loss." *Vance v. My Apartment Steak House of San Antonio, Inc.*, 677 S.W.2d 480, 484 (Tex.1984) (cited by *El Paso Natural Gas Co. v. Minco Oil & Gas Co.*, 964 S.W.2d 54 (Tex.App.-Amarillo Dec 10, 1997), *over'd on other gounds*, 8 S.W.3d 309 (Tex. 1999)).  Clover has acknowledged that it is unable to present evidence that meets this requirement.  The motion for summary judgment as to the damages claimed for the breach of Recital H is granted.

**V.     The Motion for Summary Judgment as to the Claim for Damages for the Breach of Article 2.2(d)(iii), Integrated Marketing Plan**

This court previously found disputed fact issues material to determining whether JCI breached the Subcontract by failing to develop an "integrated marketing plan for enhancing opportunities for successful expansion of the base contract" for "Other BPI North American sites," under  Article 2.2(d)(iii) of the Subcontract.  (Docket Entry No. 71 at 33).  JCI argues that Clover has produced no evidence of damages from the JCI's alleged failure to work with Clover to develop and execute such a marketing plan.  (Docket Entry No. 106 at 20–21).  Clover's damages expert does not mention such a marketing plan or identify any alleged damages from the failure to develop and execute it.  (Docket Entry No. 107, Ex. B; Docket Entry No.112).  In its response to the summary judgment motion, Clover does not respond to this argument.  The motion for summary judgment as to the damages claimed for JCI's alleged failure to develop a marketing plan is granted.

**VI.    Conclusion**

 JCI's motion for summary judgment as to damages is granted in part and denied in part.   JCI's motion to strike is granted in part and denied in part.

SIGNED on December 6, 2006, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge